**Edward Anthony ELLIS,
Petitioner–Appellant,**

v.

**James A. LYNAUGH, Director, Texas
Department of Corrections,
Respondent–Appellee.**

No. 88–2829.

United States Court of Appeals,
Fifth Circuit.

May 30, 1989.

Donald F. Killingsworth, Tyler, Tex., for petitioner-appellant.

Bill Zapalac, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

Before REAVLEY, JOHNSON and DAVIS, Circuit Judges.

REAVLEY, Circuit Judge:

Edward Anthony Ellis appeals from the federal district court's denial of habeas corpus relief from the death sentence imposed by a Texas court. We affirm.

## I. Background

In March 1983, a grand jury in Harris County returned an indictment charging Edward Ellis with the murder by asphyxiation of Bertie Elizabeth Eakins while he was in the course of committing burglary. A jury found Ellis guilty as charged and returned affirmative answers to the special punishment issues submitted pursuant to Tex.Code Crim.Proc. art. 37.071 (Vernon Supp.1989). The trial court, as required by law, sentenced Ellis to death by lethal injection. The Texas Court of Criminal Appeals affirmed. *Ellis v. State*, 726 S.W.2d 39 (Tex.Crim.App.1986), *cert. denied*, 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987). After the state courts denied his application for writ of habeas corpus, Ellis sought relief in federal court. In July 1988, the district court denied Ellis's petition for writ of habeas corpus but granted a certificate of probable cause.

On appeal Ellis alleges several grounds of error: (1) that the trial court improperly excluded two venire members in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); (2) that the evidence was insufficient to prove the allegations in the indictment; (3) that the trial court erred in failing to define the term "deliberately" for the jury; (4) that Ellis was denied a fair and impartial trial, due course of law, due process and equal protection of law and his right to be free of cruel and unusual punishment by the systematic exclusion of Hispanics from the grand juries in Harris County, Texas and from service as grand jury foremen; (5) that he was denied the effective assistance of counsel at trial and on appeal; and (6) that the district court erred in failing to conduct a hearing on the issues of ineffective assistance of counsel and systematic exclusion of Hispanics from grand jury service. Because we conclude that each of these claims is either procedurally barred or without merit, we affirm the district court's denial of the writ.

## II. The *Witherspoon* Issue

Ellis contends that two prospective jurors, Holstead and Bradshaw, were excluded improperly from serving on the jury on the basis of their opposition to the death penalty in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) and that Bradshaw's exclusion was not harmless error as found by the district court.

In *Witherspoon*, the Supreme Court held that a state violates a capital defendant's rights under the Sixth and Fourteenth Amendments when it excuses for cause all venire members who express conscientious objections to capital punishment. The Court did recognize, however, that a state has a legitimate interest in excluding those potential jurors whose opposition to capital punishment would preclude their impartiality and thereby frustrate administration of a state's death penalty scheme. In attempting to strike an appropriate balance between these two competing interests, the Court wrote that venire members may be excluded for cause if they make it

unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original).

The Supreme Court reexamined the *Witherspoon* standard in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). In deciding whether certain potential jurors had been excluded properly pursuant to the Texas statute at issue, the Court discussed its prior opinions, including *Witherspoon*, and concluded that

[t]his line of cases establishes the general proposition that a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.* The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

448 U.S. at 45, 100 S.Ct. at 2526 (emphasis added).

Recognizing that the already difficult task of distinguishing between prospective jurors whose opposition to capital punishment would impair their impartiality and those whose opposition could be set aside effectively had been made more difficult "by the fact that the standard applied in *Adams* differ[ed] markedly from the language of [*Witherspoon*]," the Supreme Court undertook to clarify the issue in *Wainwright v. Witt,* 469 U.S. 412, 421, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985). In so doing, the Court reaffirmed the above quoted standard from *Adams* as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. The Court noted that the *Adams* standard not only dispensed with *Witherspoon's* reference to "automatic" decision-making but also did not require that a juror's bias be proved with "unmistakable clarity." *Id.* at 424, 105 S.Ct. at 852.

This is because determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424–26, 105 S.Ct. 852–53 (footnote omitted). Thus, in a proceeding under 28 U.S.C. § 2254, the trial court's factual determination that a potential juror is disqualified is entitled to a presumption of correctness, absent one of the specifically enumerated exceptions contained in 28 U.S. C. § 2254(d). *Id.* at 429, 105 S.Ct. at 855. With this in mind, we turn to those claims before us.

## A. Prospective Juror Holstead

Ellis claims generally in his brief that Holstead was excluded improperly but points to nothing specific in the voir dire to support his contention. We agree that Holstead's exclusion was proper for the reasons given in the district court's opinion.

## B. Prospective Juror Bradshaw

■ Ellis argues that, because Bradshaw's answers to defense counsel's questions showed that he was qualified to serve on the jury under *Witherspoon* and *Adams,* the trial court's exclusion of him for cause was erroneous. Ellis asserts that the trial court set out to disqualify Bradshaw by taking over the voir dire and pointing out ways in which he could avoid jury service and that this conduct deprived the defendant of a full and fair hearing on the matter of juror qualification and stripped the trial court's findings of the presumption of correctness to which they normally would be entitled.

The evaluation of this contention requires study of the entire voir dire in which Bradshaw was involved. That begins with the introductory remarks the trial court made to the group of venire members before individual voir dire began. The court explained that those persons selected to serve on the jury would have to take an oath to render their verdict according to the law and the evidence. He emphasized that if any of the prospective jurors disa-

greed with some aspect of the law to the extent that they could not take the oath to follow the law, they would not be qualified to serve. The court made it plain, though, that mere disagreement with the law did not automatically disqualify one from serving as a juror. Even if a person disagreed with the law as it was explained, "if you can set that aside and still be fair and impartial then you may still be qualified to be a juror." After explaining that taking the juror's oath was a very serious matter and that knowingly violating the oath would subject a person to severe penalties, the court made the following statements:

So we are not going to make anybody, force anyone to take an oath that they can't follow. You see what I am saying? So that's why we are going back to this thing if you disagree with the law, if you disagree with the law of the indictment to the extent and degree that it is going to destroy your conscience or soul, we are not going to make you take the oath.

The trial court began Bradshaw's individual voir dire by asking if he had religious, moral or conscientious scruples against the infliction of death as a punishment for a crime in a proper case. Bradshaw answered "yes." The prosecutor then took over the questioning; he first asked Bradshaw if he would put in his own words his feelings about the death penalty:

A. The way I feel about it—say, if he did take someone's life, taking his life is not going to bring him back. So that's the eye for an eye thing and I just—

Q. [Prosecutor] You go for the two wrongs don't equal a right?

A. That's right.

Q. Now, I take it that's a pretty strong feeling you have; is that correct?

A. Ever since, you know, I have been old enough and all to really think about it I have felt that way so I would say yes.

* * * * * *

Q. [Prosecutor] ... The question I want to ask you: Keeping in mind your feelings about the death sentence and the rightness or the wrongness of the

death sentence, would you always in every case answer one of these questions no in order to prevent the Judge from assessing the death penalty?

A. I believe so.

Q. Okay. Remember the Judge asked you for a yes or no answer because of the record and only you can tell us what is in your mind.

Let me put it in this light. Are you so against the death penalty that you would always answer one of these questions no in order to prevent the death sentence from being assessed?

A. Yes.

Q. In every case?

A. Yes.

Q. And I take it, that's a very strong feeling, as you said, since you have been old enough to think; is that correct?

A. Yes.

Q. Now, I'm not going to try to change your mind but let's say I did try to change your mind. Could anybody in this courtroom change your mind about your feeling on the death penalty?

A. No.

* * * * * *

Q. [Prosecutor] ... But if you are selected for a jury, if you are qualified for a jury, you have to take an oath to follow the law and once you have taken an oath it's not like a job that you can quit and say, "Hey, this is not what I bargained for. I will find me another job. Can't do it." You are stuck until the end of trial. You may end up doing something that does violence to your insides or your conscience or your soul or your morals or ethics or whatever and we don't want that to happen but the law will not require you to take that oath if you cannot live up to the oath. Do you see what I am saying—if it is going to do violence to you.

The question I want to ask you is: Considering your feelings about the death sentence and given the choice of

taking that oath or not taking the oath in a capital murder, would you refuse to take the oath?

A. Yes.

On the basis of this exchange, the state challenged Bradshaw for cause. Defense counsel then was given the opportunity to attempt to rehabilitate Bradshaw. He asked Bradshaw to assume that he had been selected as a juror and had taken the oath and then to elaborate on how he might answer the two special punishment issues.

Q. [Defense Counsel] If you were selected as a member of the jury, could you along with the other jurors after the State having proved to the members of the jury at the guilt or innocence phase of the trial could you thereafter be able to answer Special Issues 1 and 2 provided it is proven to you beyond a reasonable doubt?

A. Yes, I could answer them.

Q. [Defense Counsel] ... If the State proved to you beyond a reasonable doubt, you as a member of the jury, beyond a reasonable doubt that these special issues should be answered yes, could you answer this yes?

A. Yes.

Q. And by the same token on Special Issue Number 2 whether there is a probability that the Defendant would commit violent acts in the future, the State would also have to prove this to you beyond a reasonable doubt. Could the State ever prove to you beyond a reasonable doubt that in order to answer this Special Issue Number 2 yes?

A. That's where—

At this point defense counsel interrupted Bradshaw and asked him to consider a hypothetical situation. He then continued his questioning:

Q. [Defense counsel] ... Now, I'm not asking you about in this particular case, in that case about the kidnapper and murderer of that campfire girls. If you can think of a crime to be so heinous that you could tell or you could answer the question yes to the Special Issue?

A. Can I say yes? I could answer yes to both of them but I don't think, you know, he should get—they should get punished but, you know, death.

The trial court, having heard Bradshaw's conflicting responses, asked some questions of its own in an attempt to clarify Bradshaw's position. The court explored the ambiguity in Bradshaw's answers, pointing out that he first said that his scruples against capital punishment were so strong that he would always answer the special issues in such a way that the death penalty would not be imposed and then said that he would answer the issues according to the law and the evidence if he took the juror's oath.

THE COURT: So then what you said earlier about having some scruples against the death penalty are not exactly what you led us to believe they are?

THE VENIREMAN: Well, I'm not going to lie, you know. If both things are yes and that's the only choice I have and it's been proven I have to answer yes and be honest with the Court and what I know is right as far as the facts in my head, I have to answer yes.

THE COURT: So then if you took the oath, if you had a choice of taking that oath to follow the law knowing full well that you have said to us about your feelings about the death penalty, are you telling me now that you would or would not?

THE VENIREMAN: I would not take the oath.

THE COURT: You would and could take the oath?

THE VENIREMAN: I would not take the oath. Either I don't understand or you don't understand. What I am saying if I had to take the oath for some reason and I was in that situation and I saw the facts and it was true I would say yes. But—I would try to avoid taking the oath because I just can't see sentencing someone to death if the situation arose.

THE COURT: Okay. The situation will arise if you are chosen as a juror in this case. You will have to vote yes or no. There is no two ways about it. And you

know if you take the oath that you will [sic] a true verdict according to the law and the evidence submitted to you, that you are going to have to answer those questions one way or another. And the question they are trying to determine is if it gets down to answering those questions and you have already taken the oath now, you see what I am saying? And you have got to answer those questions one way or another and you have got some feelings against the death penalty and at one point in time you said you don't believe in the death penalty.

THE VENIREMAN: I don't but I have to tell the truth, too.

THE COURT: What you are saying—

THE VENIREMAN: I'm going to follow it.

THE COURT: No matter whether it does injury to your conscience and your soul or not?

THE VENIREMAN: If that's what I have to do because—

THE COURT: You don't have to.

THE VENIREMAN: I'm not going to lie.

THE COURT: But you don't have to. If your feelings are so strong—we are trying to find out how strong your feelings really are and we are not arguing about it.

THE VENIREMAN: I understand that.

THE COURT: We need to find out how strong your feelings really are. If your feelings are strong enough that if you take the oath and you are going to follow your oath and it is not going to do damage to your own conscience and your own soul and if you are convinced beyond a reasonable doubt both of those questions should be yes knowing full well if you answer them yes that I am going to assess the death penalty, then you could do that?

THE VENIREMAN: If I took the oath, yes, sir, I would have to answer honestly.

THE COURT: The next question: would you take the oath?

THE VENIREMAN: No, then I would have to put myself in a situation.

Ellis maintains that, by questioning Bradshaw as he did, the trial judge was working "to disqualify the juror after he had shown he [was] qualified to sit on the jury" and that this "judicial meddling" constituted a violation of his due process and equal protection rights. In particular, Ellis asserts that the trial judge improperly suggested to Bradshaw that all he needed to do to escape jury service, and thereby avoid any moral dilemma he might have, was to say that he refused to take the juror's oath. The district court agreed, finding that the trial court's line of questioning, in which it "suggested to Bradshaw that refusal to take the oath could be used as a method to avoid the unpleasantness of being forced to deal with his qualms about the death penalty," was impermissible. The court then concluded, however, that such error was harmless. We agree with the result reached by the district court, but not with its reasoning.

We do not believe that the trial court's conduct in this case was improper.[1] As we previously noted, the trial court explained to the venire members at the outset that those individuals who had a compelling conscientious objection to the law would not be forced to take an oath to follow that law. We believe this was a justifiable, accurate instruction. After Bradshaw told the prosecutor that he would always vote no to one of the special punishment issues to prevent the death penalty from being imposed, he told defense counsel that, if required to be on the jury, he would answer the special issues truthfully. Ellis suggests that Bradshaw's responses to defense counsel's questions somehow trump the answers given to the prosecutor and that, since those responses seemed to qualify him as a juror under *Witt*, no further questions should have been asked. We disagree. Given the conflict, the trial judge "ha[d] the right, within certain limitations, to pursue a line of questioning designed to flush out [Brad-

---

1. Were we to conclude that the trial judge engaged in impermissible conduct, we would not be able to conclude, as did the district court, that such was harmless error. *See Gray v. Mississippi*, 481 U.S. 648, 107 S.Ct. 2045, 2055–57, 95 L.Ed.2d 622 (1987).

shaw's] true views." *O'Bryan v. Estelle,* 714 F.2d 365, 382 (5th Cir.1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).

Bradshaw's responses to defense counsel's questions are best understood in the context in which they were given. Defense counsel had asked Bradshaw to assume that he had already taken the oath—to assume that he had sworn to return a verdict based on the law and evidence. Quite understandably, then, when defense counsel asked him what he would do if the evidence convinced him beyond a reasonable doubt that the punishment issues should be answered affirmatively, Bradshaw answered that he would answer truthfully. To do so undoubtedly would do violence to his conscience; not to do so, however, would subject him to the criminal consequences of violating his oath.

When the court began asking Bradshaw questions of its own in an effort to resolve the conflict in his answers, it became apparent that he was still operating under the same assumption imposed by defense counsel. Bradshaw told the court that, *if he had to take the oath for some reason,* he would answer the questions truthfully. The trial court, seeing Bradshaw's confusion, reminded him that no one would be forced to take the oath if to do so would do violence to that person's conscience and soul. It was against this backdrop that Bradshaw stated that he would refuse to take the oath. We see no error here. *See Lockett v. Ohio,* 438 U.S. 586, 595–96, 98 S.Ct. 2954, 2960, 57 L.Ed.2d 973 (1978). Contrary to Ellis's assertion that the trial court's remarks were designed to suggest an escape hatch for a troublesome venireman, we believe that the court's comments were intended to and did enable Bradshaw to give a clear statement of his position so that the trial court could better assess his qualifications. Because the trial court clearly could have been "left with the definite impression that [Bradshaw] would be unable to faithfully and impartially apply the law," *Witt,* 469 U.S. at 426, 105 S.Ct. at

853, we hold that the state's challenge for cause was granted properly.[2]

## III. Procedural Default

The state argues that Ellis raises three issues on appeal that are barred from consideration on the merits due to his failure to comply with state procedural rules. Those issues are (1) his challenge to the sufficiency of the evidence to support the indictment's allegation that the manner and means of the victim's asphyxiation were unknown to the grand jury, (2) his claim that Hispanics were excluded systematically from serving on grand juries in Harris County, Texas, and (3) his claim that Hispanics were excluded systematically from serving as grand jury foremen on those same grand juries.

■ In the recent case of *Harris v. Reed,* — U.S. ——, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the Supreme Court made clear that the "plain statement rule" of *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), applies to cases on federal habeas review. Under *Long,* review of an issue of federal law is barred if the state court's opinion contains a "plain statement" that its decision rests upon adequate and independent state grounds. 463 U.S. at 1041, 103 S.Ct. at 3476. If a state court's reasons for rejecting a claim are ambiguous, however, federal review is not precluded. *Id.,* 103 S.Ct. at 3476–77. In *Harris,* the Supreme Court recognized that the problem of ambiguous state court references to state law is common to both direct and habeas review. It therefore adopted "a common solution" to this problem: "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris,* — U.S. at —— — ——, 109 S.Ct. at 1043 (quoting *Caldwell v. Missis-*

---

**2.** Because we have determined that the trial court did not engage in improper questioning of Bradshaw, we do not address Ellis's claim that

the trial court's findings are entitled to no presumption of correctness under 28 U.S.C. § 2254(d).

*sippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 2638, 86 L.Ed.2d 231 (1985)). The Court noted that, as before, when a state court addresses the merits of a claim as an *alternative* basis for denying relief, a federal court is bound by the state court's reliance on the procedural bar. *Harris,* ── U.S. at ── n. 10, 109 S.Ct. at 1044 n. 10.

█ In the state habeas corpus proceeding, the trial court held that Ellis had not preserved properly his claims for review. The court based its holding on the fact that Ellis had failed to raise the sufficiency of the evidence argument on direct appeal as required by *Ex parte McWilliams,* 634 S.W.2d 815, 818 (Tex.Crim.App. 1980), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982), and that he had failed to object to the composition of the grand jury at the earliest time possible as required by state law. *See* Tex.Code Crim. Proc.Ann. art. 19.27 (Vernon 1977); *Muniz v. State,* 672 S.W.2d 804, 807 (Tex.Crim. App.1984). The trial court then found, in the alternative, that each of Ellis's contentions failed on its merits. The Court of Criminal Appeals denied relief without written order.

Ellis made no effort either in this court or in the court below to avoid imposition of the procedural default doctrine by showing that good cause existed for his failure to comply with the state rules and that actual prejudice resulted. *Wainwright v. Sykes,* 433 U.S. 72, 84, 97 S.Ct. 2497, 2505, 53 L.Ed.2d 594 (1977). He does, however, argue that his failure to make a timely objection to the composition of the grand jury should be excused since, while his case was pending, the Supreme Court decided a case in which it held that the systematic exclusion of members of an identifiable group was a defect of constitutional magnitude. *See Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). We find no merit in this argument. *Vasquez* was by no means the first case to hold that racial discrimination in the selection of grand jurors is constitutionally impermissi-

ble. *See, e.g., Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950); *Smith v. Texas,* 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940). Accordingly, we hold that Ellis's claims are barred procedurally; however, we add a brief discussion of their lack of merit also.

### A. Sufficiency of the evidence

█ The indictment alleged that Ellis "caused the death of Bertie Elizabeth Eakins by asphyxiating the complainant in a manner and means unknown to the Grand Jury." Given this allegation the state was required to prove beyond a reasonable doubt that the grand jury, after efforts to do so, was unable to find out the manner and means by which the victim was asphyxiated. *See Brown v. State,* 704 S.W.2d 506, 508 (Tex.App.—Dallas 1986, pet. ref'd) (citing *Clark v. State,* 151 Tex.Crim. 383, 208 S.W.2d 637, 638 (App.1948)). Ellis contends that the state's evidence was insufficient in this regard. If this raises a federal due process question, it lacks merit because the state proved by convincing evidence that the grand jury was indeed unable to discover the manner and means by which the asphyxiation occurred.

### B. Exclusion of Hispanics from the grand jury

█ Ellis contends that Harris County systematically excludes Hispanics from serving as grand jurors and as grand jury foremen and that this violated his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[3] In order to secure federal habeas relief on this ground, the petitioner must show (1) that he is a member of a race or identifiable group singled out for different treatment under the state laws, as written or applied, (2) the degree of underrepresentation of his group by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors over a significant period of time, and (3) that the

---

3. Because Ellis uses the same arguments and authorities to support each of his claims, we discuss these issues together.

selection procedures employed are susceptible to abuse or are not racially neutral. *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). The state concedes that Hispanics constitute a recognizable class singled out for different treatment under the law and that the Texas "key man" method of selecting grand jurors is recognized as susceptible to abuse as applied. It argues, however, that Ellis failed to present competent evidence that showed that Hispanics have not been represented on Harris County grand juries over a significant period time in proportion to their numbers in the general population. We agree. The "evidence" Ellis presented in support of his claim was conclusory at best. This court has held that mere conclusory allegations of discrimination are insufficient to entitle an individual to relief. *Enriquez v. Procunier,* 752 F.2d 111, 115 (5th Cir.1984), *cert. denied,* 471 U.S. 1126, 105 S.Ct. 2658, 86 L.Ed.2d 274 (1985).

■ Ellis's own figures on composition of the grand jury do not entitle him to relief. Ellis contends that Hispanics comprised only 13.7% of those summoned for grand jury duty from February 1978 to November 1982. The state census bureau's figures, offered by the state in response to Ellis's habeas corpus application, show that in 1980 Hispanics comprised 15.3% of the Harris County population. This disparity (1.6%) is insufficient to support an inference of intentional discrimination.

## IV. Jury Instructions

■ Ellis asserts that the trial court erred in failing to define the term "deliberately" in its instructions to the jury. This argument is meritless. Both this court and the Texas Court of Criminal Appeals have held that the word "deliberately" in its common meaning is sufficiently clear to allow the jury to decide the special issues on punishment. *Thompson v. Lynaugh,* 821 F.2d 1054, 1060 (5th Cir.), *cert. denied,* 483 U.S. 1035, 108 S.Ct. 5, 97 L.Ed.2d 794 (1987); *King v. State,* 553 S.W.2d 105, 107 (Tex.Crim.App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978).

## V. Effective Assistance of Counsel

■ Ellis next alleges that his attorneys rendered ineffective assistance both at trial and on appeal. To prevail on such a claim, a defendant must show that counsel's performance was deficient—or unreasonable in light of prevailing professional norms—and that the deficiency prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). We are extremely deferential in our scrutiny of counsel's performance and make every effort to eliminate "the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2065. We measure appellate counsel's effectiveness by this same standard. *Wicker v. McCotter,* 783 F.2d 487, 497 (5th Cir.), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986).

### A. Trial Counsel

Ellis maintains that he received ineffective assistance at trial due to counsel's failure (1) to investigate the case adequately, (2) to present the defense of insanity, (3) to ascertain the names and addresses of witnesses against Ellis and to interview the same, (4) to object to the racial composition of the petit and grand juries, (5) to request a jury instruction on lesser included offenses, and (6) to request a jury instruction on the term "deliberately." In his state court petition for habeas relief, Ellis alleged these same deficiences on the part of his attorneys. The trial court ordered defense counsel to submit affidavits in response to the claims and, based on those affidavits, the trial court made numerous findings of fact concerning the attorneys' performance. According to 28 U.S.C. § 2254(d), we presume the state court's findings to be correct.

The district court addressed at length each ground of error that Ellis raised before deciding that this claim was without merit. Our review of the record convinces us that no other result could have been reached. Therefore, for those same reasons given by the district court, we con-

clude that Ellis received effective assistance at trial.

### B. Appellate Counsel

In rather conclusory terms Ellis also alleges that he did not receive effective assistance on appeal. He suggests that the deficiency was in counsel's failure to raise meritorious claims on appeal. The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal. *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983). Here it appears that appellate counsel chose to concentrate on the six strongest points of error on appeal; that is a reasonable tactic. Ellis has not directed our attention to any issues that counsel failed to raise upon which he was likely to prevail on appeal. This claim is without merit.

### VI. Evidentiary Hearing

Finally, Ellis contends that the district court erred in failing to hold an evidentiary hearing to explore his claims that he received ineffective assistance of counsel and that Harris County systematically excluded Hispanics from grand juries. To receive a federal evidentiary hearing, the burden is on the habeas corpus petitioner to allege facts which, if proved, would entitle him to relief. *Wilson v. Butler,* 825 F.2d 879, 880 (5th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). The court need not " 'blindly accept speculative and inconcrete claims' as the basis upon which to order a hearing." *Lavernia v. Lynaugh,* 845 F.2d 493, 501 (5th Cir.1988) (quoting *Baldwin v. Blackburn,* 653 F.2d 942, 947 (5th Cir.1981), *cert. denied,* 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475 (1982)). Nor is a hearing required when the record is complete or the petitioner raised only legal claims that can be resolved without the taking of additional evidence. *Id.*

Ellis's claim that Hispanics were excluded systematically from Harris County grand juries is certainly a "speculative and inconcrete" claim. As we already determined, Ellis did not and, more impor-

tantly, apparently could not allege facts or produce evidence sufficient to make out a prima facie case of discrimination in Harris County's grand jury selection. Therefore, no evidentiary hearing was warranted on that issue. As for his allegations of ineffective assistance of counsel, the state court ordered trial counsel to file affidavits addressing the allegations of ineffectiveness in Ellis's application. On the basis of those affidavits, the trial court made its findings. We have held that the denial of a state writ application on the basis of pleadings and affidavits constitutes an adequate "hearing." *Evans v. McCotter,* 805 F.2d 1210, 1214 (5th Cir.1986). Ellis made no new ineffectiveness allegations in his federal petition; no additional hearing was required.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

JOHNSON, Circuit Judge, dissenting:

The majority today concludes that the trial court properly excused venireman Bradshaw for cause. This conclusion, in this writer's mind, is erroneously based on the assumption that the trial court "clearly could have been 'left with the definite impression that [Bradshaw] would be unable to faithfully and impartially apply the law.' " *Wainwright v. Witt,* 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841 (1985). The above rule of law which was first enunciated by the Supreme Court in *Witt* does not disturb the essence of the earlier holdings of the Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) to the effect that a juror shall not be challenged for cause unless his "views [on capital punishment] would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* 469 U.S. at 420, 105 S.Ct. at 850 (quoting *Adams v. Texas,* 448 U.S. 38 at 45, 100 S.Ct. at 2526). Against the backdrop of the above standards, the record in this case compels the conclusion that venireman Bradshaw, had he been sworn to take the oath as a juror, would

have performed his duties as a juror in accordance with his instructions and his oath. I therefore respectfully dissent from the conclusion of the majority that venireman Bradshaw was properly excused for cause.

During voir dire, in response to questions posed by the prosecutor, Bradshaw indicated that he harbored strong feelings disfavoring the death penalty. Responding further to prosecutorial probing, Bradshaw stated "I believe so" when asked whether he would answer "no" to a special issue so as to prevent the imposition of the death penalty. During rehabilitative questioning by defense counsel, however, Bradshaw categorically asserted that if he were sworn as a juror he would "tell the truth" when answering special issues even if the result would be the imposition of the death penalty on the defendant. As I view the record, the prosecutor's questions were designed to elicit Bradshaw's scruples against the death penalty. In contrast, questions from defense counsel sought to establish whether Bradshaw was willing to abide by the law concerning the death penalty if he were sworn as a juror regardless of any personal attitude that he might have regarding capital punishment. After reviewing the record on what must be the essential inquiry of whether Bradshaw could and would have faithfully and impartially applied the law concerning the death penalty, I am convinced that Bradshaw, had he been sworn as a juror, would have done so. When questioned repeatedly about adhering to the juror's oath, Bradshaw pledged that if sworn as a juror he was "going to follow it [the oath]," that he "would have to answer honestly," and that he was "not going to lie." Significantly, even after the trial court reminded Bradshaw of his previously articulated scruples concerning the death penalty, Bradshaw persisted in his assertion that "[i]f I took the oath, yes, sir, I would have to answer honestly."

On the basis of the above testimony of Bradshaw, I am unable to join in the conclusion of the majority that Bradshaw could have given the trial court the *"definite* impression that he would be unable to faithfully and impartially apply the law." *Witt,* 469 U.S. at 426, 105 S.Ct. at 853. (emphasis supplied). To the contrary, Bradshaw's responses concerning his ability to faithfully and impartially apply the law if selected and sworn as a juror, indicate a remarkable objectivity, honesty and respect for the law particularly when viewed in the light of his admitted reservations regarding capital punishment.

In sum, the guarantees afforded a capital defendant by the sixth amendment must not be eroded in the guise of what is characterized as a line of questioning designed to "flush out [a potential juror's] true views." The recognition by the Supreme Court that the "voir dire practice of 'death qualification'—the exclusion for cause, in capital cases, of jurors opposed to capital punishment—can dangerously erode this 'inestimate safeguard [against the overzealous prosecutor and the biased judge]' by creating unrepresentative juries 'uncommonly willing to condemn a man to die'," *Wainwright v. Witt,* 469 U.S. 412, 439, 105 S.Ct. 844, 860 (Brennan, J., dissenting), is as vital today as it was during Witherspoon's trial. *Witherspoon,* 391 U.S. 510, 521, 88 S.Ct. 1770, 1776. So long as a potential juror expresses a willingness to abide by the law regardless of his personal views on capital punishment, that juror should not be challenged for cause. Indeed, in the instant case, juror Bradshaw evinced not only a willingness, had he been sworn as a juror, to adhere to the law, but a categorial and resolute determination to do so. It is for this reason that I must respectfully dissent.