**Troy Dale FARRIS,**

v.

**Gary JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division.**

Civil Action No. 4:94–CV–142–Y.

United States District Court,
N.D. Texas,
Fort Worth Division.

June 17, 1997.

Amanda Levin, Texas Resource Center, Austin, TX, for Plaintiff.

James Byron Matthews, Law Office of James B. Matthews, Austin, TX, for Defendant.

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND LIFTING STAY

MEANS, District Judge.

Pending before the Court is the petition for writ of habeas corpus filed by Troy Dale Farris on March 2, 1994. This action was referred to Magistrate Judge Charles Bleil, pursuant to 28 U.S.C. § 636(b)(1)(B), for an evidentiary hearing if necessary, and for his proposed findings, conclusions, and recommendation. The magistrate judge entered his findings, conclusions, and recommendation on January 24, 1997, recommending that the petition for writ of habeas corpus be granted. Having carefully considered the petition for writ of habeas corpus, the recommendation of the magistrate judge, the objections filed by the parties, the record as a whole, and the applicable law, the Court finds that the findings and conclusions of the magistrate judge should be accepted in part and rejected in part, and further, that the petition for writ of habeas corpus should be DENIED.

The opinion of the magistrate judge adequately sets out the background facts and procedural history of this case, therefore, the Court will not repeat them here. Further, for the reasons stated in the magistrate judge's opinion, the Court hereby adopts the findings and conclusions of the magistrate judge with the exception of section VIII, part Q, subsection 3, "State's Challenge for Cause to Venire Member Janice Goodson."[1]

▉ The petitioner asserts that the trial court erred in sustaining the state's chal-

Raoul Dieter Schonemann, University of Texas School of Law, Austin, TX, Maurie

---

1. The magistrate judge has recommended that the petition for writ of habeas corpus be granted only as to the petitioner's contention that the trial court mistakenly granted the state's challenge for cause to venireperson Janice Goodson. The magistrate judge's analysis of this issue is set out in section VIII, part Q, subsection 3. The magistrate judge recommended that the petition for writ of habeas corpus be denied as to all of the petitioner's other issues. The Court adopts the findings, conclusions, and recommendation of the magistrate judge as to all of these rejected points of error. These findings and conclusions are set out in sections I through VII; section VIII, parts A through P; section VIII, part Q, subsections 1, 2, 4, and 5; and section IX of the magistrate judge's opinion.

lenge for cause to venireperson Janice Goodson. The Court finds that the trial court's exclusion for cause of Ms. Goodson was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,"[2] and further, that the exclusion was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.

◾ A juror may properly be removed for cause if his views on the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). Further, the Court in *Witt* held that this standard "does not require that a juror's bias be proved with unmistakable clarity." *Witt,* 469 U.S. at 424, 105 S.Ct. at 852 (internal quotations omitted).

◾ The trial court's determination that a juror should be excluded for cause is a finding of fact, and as such is entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *Id.* at 426–29, 105 S.Ct. at 853–55; *Woolls v. McCotter,* 798 F.2d 695, 699 (5th Cir.), *cert. denied,* 478 U.S. 1031, 107 S.Ct. 15, 92 L.Ed.2d 769 (1986). This presumption of correctness is necessary "[b]ecause of the difficulty of divining a prospective juror's state of mind, particularly on a cold record." *Granviel v. Lynaugh,* 881 F.2d 185, 187 (5th Cir.1989), *cert. denied, Granviel v. Texas,* 495 U.S. 963, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990). The trial judge is uniquely qualified to make determinations of credibility as to prospective jurors because of his ability to observe their demeanor, inflection, and other mannerisms which cannot be conveyed in a transcript. "The manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear

case." *Witt,* 469 U.S. at 428 n. 9, 105 S.Ct. at 854 n. 9 (quoting *Reynolds v. United States,* 98 U.S. 145, 156–57, 25 L.Ed. 244 (1878)).

In the instant case, the trial court found that "having observed the demeanor of the juror and her answers to various questions . . . her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath." (Statement of Facts vol. 10 at 752 [hereinafter, "Goodson Voir Dire"].)

In response to a multiple-choice question on the jury questionnaire, veniremember Goodson chose the answer that stated that she could never assess the death penalty under any circumstances. The subsequent voir dire of Ms. Goodson was lengthy and involved questioning by counsel for the state, counsel for the petitioner, and the court. The prosecution began by following up on Ms. Goodson's written opposition to the death penalty:

Q. I presume then that you are opposed to capital punishment?

A. Yes I am.

Q. And I will repeat that question one more time and this is important for the record in this case. Could you, under any circumstances as a juror in a criminal case, vote to return the death penalty?

A. No.

(Goodson Voir Dire at 724–25.) Defense counsel then proceeded to explain the Texas capital sentencing procedure with the bifurcated trial and special issues and asked Ms. Goodson a series of questions:

Q. The question that I have of you is whether or not your feeling about the death penalty is so strong and is so fixed that you feel that you would not be able to answer these factual questions fairly and truly and honestly without regard for the consequences. That was a long question.

A. You are asking me if I feel strongly enough about the death penalty that I would not—that I would say not guilty,

---

**2.** 28 U.S.C. § 2254(d)(2) (as amended 1996).

so I wouldn't have to say it; is that what you are saying.

Q. Yes, ma'am. Regardless of what the facts were presented by the State of Texas.

A. No, I would not do that.

Q. You would make up—we are taking this in two stages.

A. I would try to do the best that I thought the reasonable outcome should be.

Q. Your oath of office as a juror would require you to render a true verdict, and what that means, I can tell you, is to render a verdict based upon the evidence, based upon the facts, not based on what you want to have happen. So at the first stage of the trial you see no difficulty and you could do that? Difficulty is not the right word. You could do that?

A. I would not like to.

Q. Okay.

A. But on the other hand, if I were to be placed in that position—

Q. Uh-huh.

A. —then I would do the best that I could.

(Goodson Voir Dire at 730–31.) Defense counsel then focused his questioning on the sentencing phase of the trial and Ms. Goodson's ability to answer the special issues according to the evidence:

Q. All right. Does your feeling about the death penalty—and, you know, what the consequences of yes answers would be and you know what the consequences of no answers would be—Is your feeling about the death penalty such that you do not feel that you could fulfill the oath of office that you would have to take and answer those questions 1, 2 and/or 3, if 3 were to be given to you, that you could not answer those questions fairly and truly and honestly just as your oath requires you.

A. I can only tell you that I would do my best. That I would not deliberately do otherwise.

. . . .

What I was about to try—and I don't know if being up here is going to help at all. What we have got is we have jurors who have to make the decisions about the facts in the case. They have to make those decisions based on the evidence and what the law is trying to do by saying that a juror must make those decisions based on the facts, is trying to keep the jurors from jumping the gun, if you will, from going around what the facts are just in order to arrive at a certain outcome. Does that make any sense?

A. Yes.

Q. So the law says this wouldn't be proper for the jurors just to say, well, I am a juror and I get to write in a yes or no up here, but because I want it to come out a certain way, I am just going to disregard the facts; I am not going to pay any attention to the evidence in the case and in order to arrive at a certain outcome I will just answer the questions in a certain way that I know is going to bring about the outcome. The law says that we must go through step-by-step; that the jurors must answer the questions based upon the facts and then the outcome is set out by the law and falls on the Judge. I just want to make sure we don't have any misunderstanding.

A. You are asking me if I feel strongly enough about the death penalty that if I think he is guilty I am going to say, no, he is not guilty so he doesn't get the death penalty? You are asking me if I would do that?

Q. Yes, ma'am. That would be at the first stage, yes, ma'am.

A. I would not deliberately.

. . . .

Q. Just as you would not automatically vote not guilty to keep somebody from getting the death penalty because that would be contrary to your oath, as I understood your earlier answer you wouldn't automatically vote no to these questions to keep somebody from getting the death penalty because that also would be contrary to your oath. Have I misstated your answer? If I have—

A. No, that's sound like what I said.

Q. No one is asking you to like or dislike the death penalty. No one is asking you to put yourself in the role of judge because that's not your job. Your job as a juror would be to answer the questions, the factual questions, and I take it, regardless of your feelings one way or another that you could do that because that's what your oath requires you to do?

A. Yes. I wouldn't want to; I wouldn't like to, but I would.

. . . .

Would you follow the law and would you be able to, in fact, base your decision upon the facts of the case rather than personal opinion or personal feelings recognizing that that's not the job of the juror? The job of the juror is to base their decisions on the facts.

A. I would do the best I could.

(Goodson Voir Dire at 733–39.) The Court then proceeded to question Ms. Goodson:

Q. Mrs. Goodson, when you filled out this questionnaire, was it your intention to sign this No. 3 which said, "I could never under any circumstances return a verdict which assessed the death penalty?" Is that what you said?

A. Yes.

Q. All right. Now, as Counsel has told you, if the Defendant is found guilty you will then be asked to answer these three questions yes or no. If you answer those two or three questions yes, depending on whether the third one is used, you will be assessing the death penalty. Now, which is proper? That you could not under any circumstances, as you said here, or can you follow the instructions of the Court and answer these questions yes in the proper case? Which is it? Nobody is mad at you. We just need to know.

A. The problem I have with that question is that I am not sure that the way it's worded says what it means.

Q. What are you referring to?

A. It says under any circumstances.

Mr. Lane: Judge, is this the complete questionnaire? Are you talking about the whole questionnaire?

A. Yes. It says, would I under any circumstances return the death penalty. That's what that says and I said no. Okay. I didn't understand what that was asking me. What I understood was if, indeed, that he was found guilty then were we to say, yes, we want the death penalty and would I do that. That's what I understood. I did not understand that I would be required to come here and answer the questions and decide what I felt was right or not, and that in saying that I thought he was guilty then I would be, in fact, saying that I was for the death penalty.

Q. All right. Now, well, it still comes back to a situation where the jury might be asked to assess punishment in this case. They do not assess punishment as it is done in other type cases, but they are asked to answer those three questions yes or no, and I think you have surmised from talking to Counsel for each side that if you vote yes to 1, 2 and/or 3 you will have voted to assess the death penalty. Now could you, in a proper case, if the facts warranted, do that?

A. I could. I wouldn't want to. I wouldn't want to, but I would.

Q. Would it violate your conscience to vote yes in the proper case and the proper evidence?

A. Yes, it would.

(Goodson Voir Dire at 739–42.) Counsel for the defense then requestioned Ms. Goodson:

Q. Let me ask you, Mrs. Goodson, this: Mrs. Goodson, you could follow the law, is what I understood your answers to be; is that correct? That you don't like being placed in this position and you wouldn't want to do it, but with the full explanation, and I am not talking about that very brief question that was asked on the questionnaire because as you can see by that question it really didn't tell you what the procedure is. It really didn't tell you what all you may be faced with.

A.   I feel like if I were told that I had to come to the Court and had to listen to the facts and if I listened to those facts and felt like he was guilty then I would not deliberately say, no, he is not. I would not want to be in that position. I would hate very badly to be in that position, but I don't feel like I could do otherwise than what the law says I have to do.

Q.   You would follow the law? You wouldn't violate your oath of office?

A.   I would not, no.

Q.   By the same token, at the second stage you would not violate your oath and automatically vote one way or another? Here again, you would base your answers on the facts?

A.   Yes, I will.

. . . .

The Court: Each answer I get from her still goes back to guilt or innocence. I don't think we have got over that point and I would appreciate you working on that area.

(Goodson Voir Dire at 743–44.) The prosecution again explained the bifurcated death penalty procedure in Texas, and questioned Ms. Goodson further:

Q.   Now—all we are trying to do here is— and believe me, I don't think that there is anyone in this courtroom that doesn't respect your opinion, and all we are trying to do, just as you have a right to have an opinion, the law gives us the right to find out what it is. Now you have indicated on this questionnaire and I want to ask you if this is your signature. Is that your signature?

A.   Yes, it is.

Q.   And did you or did you not circle this question, I could never under any circumstances return a verdict which assessed the death penalty, and you had four choices and you chose that one?

A.   Yes, I did.

Q.   Was that your answer?

A.   Yes.

. . . .

Q.   Mrs. Goodson, really, we are down here about serious business and we'd just like to know what your opinion is and that's what I'm trying to find out.

A.   I am willing to do what I can. I understand perfectly.

Q.   On this page you had the possibility of answering four different questions, and I refer to page 5 of this questionnaire, that you have told and that you have signed and in response to the following question with reference to the death penalty, which of the following statements would best represent your feelings, circle one. No. 1, I believe the death penalty is appropriate in some cases. You didn't circle that one, did you?

A.   No, I didn't.

Q.   No. 2, although I do not believe that the death penalty should ever be involved[,] so long as the law provides for it I could assess if I believed the facts warranted it, and you didn't circle that one, did you?

A.   No, I didn't.

Q.   No. 3, I could never under any circumstances return a verdict which assessed the death penalty, but you did circle that one, didn't you?

A.   Yes, I did.

Q.   No. 4, none of the above; you didn't circle that one, did you?

A.   No, sir, I didn't.

Q.   Seated right there where you are, I asked you a while ago are you opposed to capital punishment?

A.   Yes, I am.

. . . .

Q.   Did you or did you not answer my question a while ago that you were opposed to capital punishment?

A.   Yes, I am.

Q.   Is that your final answer?

A.   I feel like I have no choice. I mean, I am told that I have to come—yes, I am told I have to come to this jury and I have to listen to the facts and if I listen to these facts then I have to personally say if I believe he is guilty or not.

That's my responsibility. I have no choice, you know, I really don't want to do it and I don't believe in it and I don't want to do it, but if the State of Texas tells me that I have to do it, I have no choice.

Q. Nobody is telling you you have to do anything. That's the reason we have this legal system we have. Nobody is about to tell you to do anything.

A. If I am chosen, if I have to come to this jury then I don't have a choice.

Q. You certainly do have a choice. You get a vote.

A. I can say the man is guilty. Well, I believe there is other ways of dealing with that person being guilty than the death penalty.

(Goodson Voir Dire at 746–50.) The Court then struck the juror for cause stating that:

The Court having observed the demeanor of the juror and her answers to various questions, finds her views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath and she is, therefore, discharged and excused from the case.

(Goodson Voir Dire at 752.)

The Court finds that the trial court's determination that Ms. Goodson's views on the death penalty would substantially impair her ability to serve as a juror was not unreasonable in light of the evidence presented. Further, the Court finds that the decision was not contrary to, nor did it involve an unreasonable application of, federal law.

Ms. Goodson clearly wavered in her answers regarding the death penalty depending on who was questioning her at the time. Her answers to the prosecution's questions, however, were more clear and adamant than her answers to the defense's questions. She was certain in her opposition to the death penalty, but when asked whether she could answer the factual issues fairly based on the evidence she stated that she "would not deliberately do otherwise," and that she "would do the best that [she] could." In answer to the trial court's questions about answering the special issues yes in a proper case, Ms.

Goodson stated that "I could. I wouldn't want to. I wouldn't want to, but I would." The trial court, however, immediately asked her whether it would violate her conscience to assess the death penalty in a proper case with the proper evidence, and Ms. Goodson said that it would.

*Ellis v. Lynaugh,* 873 F.2d 830 (5th Cir.), *cert. denied,* 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 384 (1989) addressed a factual scenario similar to the case at bar. In *Ellis,* prospective juror Bradshaw stated that he was opposed to the death penalty, could never assess it, and would vote no on at least one of the special issues—regardless of the evidence—to avoid imposing the death penalty. However, under questioning by defense counsel, the juror stated that if he were under oath as a juror, he would answer the special issues truthfully according to the evidence. *Id.* at 834–36. The juror was torn between his adamant opposition to capital punishment, and his inability to violate his oath as a juror. The Fifth Circuit recognized the contradiction implicit in Bradshaw's testimony: that he could answer the special issues truthfully under oath as a juror, but that "[t]o do so undoubtedly would do violence to his conscience; not to do so, however, would subject him to the criminal consequences of violating his oath." *Id.* at 837. The Fifth Circuit concluded that the trial court could have been "left with the definite impression that [Bradshaw] would be unable to faithfully and impartially apply the law." *Id.* (quoting *Witt,* 469 U.S. at 426, 105 S.Ct. at 853).

Likewise, in this case, Ms. Goodson may have been able to fairly answer the special issues as a juror, but to do so would have violated her conscience. Because her answers in opposition to the death penalty were clear and unambiguous while her answers which indicated that she could impose the death penalty were tentative, the trial court could have been left with the definite impression that Ms. Goodson could not faithfully and impartially apply the law.

Under 28 U.S.C. § 2254, it is not for this Court to substitute its judgment for the trial court's. The trial court's determination is presumed correct. The standard for exclud-

**207**

ing a juror for cause is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* 469 U.S. at 424, 105 S.Ct. at 852 (citations and internal quotations omitted). This standard does not require that the juror's bias be proved with unmistakable clarity. *Id.* The Supreme Court has stated that:

> determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear;" these veniremen may not know how they will react when faced with imposing the death sentence, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.... this is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424–26, 105 S.Ct. at 852–53. Accordingly, because of the ambiguity in the record and the presumption that the trial court's factual rulings are correct, the Court holds that the petitioner is not entitled to relief under 28 U.S.C. § 2254.

The magistrate judge recommended that the petition be granted as to the exclusion of Ms. Goodson. In concluding that Ms. Goodson was improperly excluded for cause, the magistrate judge relied heavily on two opinions of the Texas Court of Criminal Appeals. In *Farris v. State,* 819 S.W.2d 490 (Tex.Crim. App.1990), *cert. denied,* 503 U.S. 911, 112 S.Ct. 1278, 117 L.Ed.2d 504 (1992), on direct appeal of the case at bar, the Court of Criminal Appeals held that the dismissal of Juror Goodson was not error. That court found that Ms. Goodson vacillated on the issue of

whether she could answer the three questions at the punishment phase of the trial. Relying partially on *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the court deferred to the decision of the trial judge and held that he did not abuse his discretion in granting the prosecution's challenge for cause to Ms. Goodson. *Farris,* 819 S.W.2d at 501.

In *Riley v. State,* 889 S.W.2d 290 (Tex. Crim.App.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 2569, 132 L.Ed.2d 821 (1995), the Court of Criminal Appeals, relying extensively on *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), held that veniremember Brown had been improperly excused for cause based on her views of the death penalty. The testimony of veniremember Brown was similar, although not identical to the testimony of Ms. Goodson in the present case.[3] The Court of Criminal Appeals concluded that Brown had been improperly "excluded on a 'broader basis than (her) inability to follow the law....' in violation of the Sixth and Fourteenth Amendments." *Riley,* 889 S.W.2d at 296 (quoting *Adams,* 448 U.S. at 48, 100 S.Ct. at 2528). The court distinguished *Farris v. State,* 819 S.W.2d 490, stating that "[t]his is also not the case where a veniremember is challenged due to her 'vacillation' regarding her feelings on the statutory punishment issues." *Riley,* 889 S.W.2d at 296 (citing *Farris,* 819 S.W.2d 490).

On motion for rehearing in *Riley,* the State of Texas argued that the court's opinion in *Riley* effectively overruled *Farris.* The Court of Criminal Appeals agreed that *Riley* was inconsistent with *Farris* and expressly overruled *Farris.* The court's opinion on rehearing in *Riley* discussed the facts of Juror Goodson's testimony in *Farris* and found that Ms. Goodson had "insisted that she would not violate her oath to render a true verdict, and unambiguously and unwaveringly insisted she would answer the special

---

**3.** Brown testified that she strongly opposed the death penalty based on her religious and moral beliefs, but she asserted that she could sacrifice those beliefs and render a true verdict based on the evidence. The record indicates that Brown

was clear and unwavering in her assertion that she could set aside her religious and moral beliefs and impose the death penalty in the proper case. *Riley,* 889 S.W.2d at 295–96.

issues honestly and in accordance with the evidence." *Riley*, 889 S.W.2d at 300. The court concluded that Ms. Goodson had, in fact, not vacillated in her testimony regarding the death penalty, and, thus, concluded that Farris had been wrongly decided. *Id.* at 300–01.

While the Texas Court of Criminal Appeals is the ultimate arbiter of Texas state criminal law, the Court is of the opinion that as a matter of federal constitutional law, the Court of Criminal Appeals in *Riley* misinterpreted the applicable Supreme Court precedent—*Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)—in concluding that Ms. Goodson was improperly excluded for cause. As the Court here is primarily charged with assuring that the trial court's decision was not contrary to federal law, the Court is not compelled to accept the conclusions of the Court of Criminal Appeals in *Riley*. The testimony of Ms. Goodson presents the textbook case for when a reviewing Court, pursuant to a § 2254 review, should defer to the judgment of the trial judge regarding the credibility and demeanor of a potential juror. The Court so defers here.

For the foregoing reasons, the Court hereby ORDERS that the petitioner's application for writ of habeas corpus is DENIED. It is further ORDERED that the stay of execution issued March 3, 1994 is hereby LIFTED.

SO ORDERED.