Michael Lynn **RILEY**, Appellant,

v.

**The STATE of Texas, Appellee.**

No. 69738.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 10, 1993.

Rehearing Denied Feb. 9, 1994.

Opinion Overruling Motion for
Rehearing Dec. 21, 1994.

Bill Frizzell, Tyler, for appellant.

Marcus D. Taylor, Dist. Atty., and Henry G. Whitley, Asst. Dist. Atty., Quitman, Robert Huttash, State's Atty., Austin, for the State.

*OPINION*

BAIRD, Judge.

Appellant was convicted of capital murder pursuant to Tex.Penal Code Ann. Sec. 19.03(a)(2).[1] The jury affirmatively answered the three issues submitted under Tex.Code Crim.Proc.Ann. art. 37.071(b).[2] Punishment was assessed at death. *Id.* at (e). Appeal to this Court is automatic. *Id.* at (h). We will reverse.

As appellant does not challenge the sufficiency of the evidence, we will dispense with a recitation of any facts unnecessary to the resolution of the point of error under consideration. In point of error six, appellant contends Veniremember Bulah Brown was improperly excluded from jury service because her views on the death penalty would not have "substantially impaired" her performance as a juror.

### I. *Adams v. Texas*

In *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Supreme Court held former Texas Penal Code Section 12.31(b) may not be used to exclude veniremembers who acknowledge they "might" be affected by the death penalty.[3] *Adams,* 448

---

1. Tex.Penal Code Ann. Sec. 19.03 provides in part:
   (a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:
   (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, or arson;

2. Appellant was convicted on November 17, 1986. All references to Tex.Code Crim.Proc.Ann. art. 37.071 will be to the statute as it appeared then, prior to its amendment on September 1, 1991.
   Tex.Code Crim.Proc.Ann. art. 37.071(b) provides:
   (b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:
   (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
   (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and....

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

3. Former Texas Penal Code art. 12.31(b) provided:

   Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. *A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact.*
   This article was amended and the italicized portion deleted in 1991 pursuant to *Adams.* It now states:
   In a capital felony trial in which the state seeks the death penalty, prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. In a capital felony trial in which the state does not seek the death penalty, prospective jurors shall be informed that the state is not seeking the death penalty and that a sentence of life imprisonment is mandatory on conviction of the capital felony.

U.S. at 49, 100 S.Ct. at 2528. A potential juror may not be challenged for cause based upon his views about capital punishment unless those views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams*, 448 U.S. at 45, 100 S.Ct. at 2526.

In *Adams*, seven veniremembers were excluded from jury service because they were unable to take an oath that the mandatory penalty of death or imprisonment for life would not affect their deliberations. *Adams*, 448 U.S. at 40, 100 S.Ct. at 2524. Our review of the record in *Adams* reveals two veniremembers testified similarly to Brown and will, therefore, provide guidance for our analysis of this case.

### Veniremember White

White testified although she believed in capital punishment, she could not participate in a proceeding in which the death penalty was handed down. White felt the mandatory sentence of death or life would affect her deliberations in a case. The trial judge asked White if she could ever, in a capital murder case, vote yes to all three statutory punishment issues if evidence had proven them, and White responded, *"I don't think so."* [4] Upon further examination, White finally stated she could set aside her feelings and vote "yes" to the statutory punishment issues if the facts justified it. However, at the end of her testimony White vacillated on this issue. When defense counsel again asked White if she could lay her feelings aside and answer the questions honestly she replied, "I did but I cannot say yes to that now. That is not—*I couldn't lay my feelings aside."*

### Veniremember Ferguson

Ferguson testified he was opposed to capital punishment. Ferguson felt it would be "almost impossible" for him to render a death penalty verdict, and stated he had "grave doubts" about ever being able to vote for death. Ferguson could not conceive of a case wherein he would vote for the death penalty. When asked if he would "automatically" vote against the death penalty, Ferguson replied, *"With my conscious, yes."*

After an explanation of the Texas statutory punishment issues, Ferguson testified he thought he could honestly try to answer the questions but he did not want to vote for the death penalty. Ferguson again testified he felt he would automatically vote against the death penalty. Upon further examination, the trial judge asked:

> Trial Judge: Is what you're saying, knowing he would go to the electric chair, are you saying that would affect your ability to answer those questions?

> Ferguson: *It wouldn't affect my ability,* but it would cause me to do some squirming trying to be honest in my answers if I felt like the answers to the three questions was yes.

At the conclusion of both White's and Ferguson's testimony, the trial judge sustained the State's challenges for cause. We affirmed. *Adams v. State*, 577 S.W.2d 717 (Tex.Cr.App.1979).

The Supreme Court held the exclusion of the veniremembers was improper. The Court reasoned a juror's performance could be influenced by his views on the death penalty without exceeding " 'guided jury discretion' ". *Adams*, 448 U.S. at 47, 100 S.Ct. at 2527. Thus, "if prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." *Adams*, 448 U.S. at 48, 100 S.Ct. at 2528, citing *Witherspoon v. Illinois*, 391 U.S. 510, 522, n. 21, 88 S.Ct. 1770, 1777, n. 21, 20 L.Ed.2d 776 (1968). Such exclusion violates the Sixth and Fourteenth Amendments to the U.S. Constitution. *Adams*, 448 U.S. at 50, 100 S.Ct. at 2529. In emphasizing the breadth of its holding the Court stated:

> . . . Nor in our view would the Constitution permit the exclusion of jurors from the penalty phase of a Texas murder trial if they aver that they will honestly find the facts and answer the questions in the affirmative if they are convinced beyond rea-

4. Unless otherwise indicated, all emphasis is supplied.

sonable doubt, but not otherwise, *yet who frankly concede that the prospects of the death penalty may affect what their honest judgment of the facts will be or what they may deem to be a reasonable doubt.* Such assessments and judgments by jurors are inherent in the jury system, and to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law.

*Id.*

## II. *Application By This Court*

We have considered *Adams* on numerous occasions, namely, *Cuevas v. State,* 641 S.W.2d 558 (Tex.Cr.App.1982); *Turner v. State,* 635 S.W.2d 734 (Tex.Cr.App.1982); *Durrough v. State,* 620 S.W.2d 134 (Tex.Cr. App.1981); *Pierson v. State,* 614 S.W.2d 102 (Tex.Cr.App.1981). Two cases in particular, *Cuevas* and *Durrough,* contain testimony similar to that of Brown and will, therefore, be discussed in detail.

In *Cuevas,* 641 S.W.2d at 560, the venire-member testified "that under no circumstances could he participate as a juror in returning a verdict that would require the court to assess the death penalty." After an explanation of the Texas statutory punishment issues, the veniremember testified:

Trial Judge: Now, you have expressed an objection to the death penalty. Would you feel that your conscientious objection to the death penalty as such, that it would affect your deliberation upon his guilt in the first instance or on either of the questions of fact, on those questions that I asked?

Veniremember: No.

\* \* \* \* \* \*

Trial Judge: *You believe you can successfully set that aside and base you answers solely and exclusively upon the evidence you hear in the trial of the case?*

Veniremember: *Yes, sir.*

\* \* \* \* \* \*

Prosecutor: So you are saying the fact that the death penalty is a possible punishment, that fact would influence you in your decision as to how you answer these two punishment questions, right?

Veniremember: It probably would. Yes.

Prosecutor: Could you say yes or no?

Veniremember: Yes. Of course, it would certainly be in my mind, surely, *it would influence me.*

\* \* \* \* \* \*

Veniremember: ... I would try to be as fair as possible, but I do have—

Prosecutor: If you were that opposed to the death penalty, I could understand how it would affect you, and you just told me it would.

Veniremember: Sure it would.

\* \* \* \* \* \*

Defense Counsel: Even though a juror feels that way, and I think it's proper that they should certainly be concerned about this life or death issue, *but if you could answer yes to those questions if the State convinced you beyond a reasonable doubt that the answers should be yes, then you should serve and do your duty as a juror.*

Veniremember: *That's right.*

Defense Counsel: *Can you do that?*

Veniremember: *Yes.*

Defense Counsel: So it would depend on the evidence that you heard?

Veniremember: Yes.

Defense Counsel: *And if you were convinced beyond a reasonable doubt, it wouldn't affect your feelings on the death penalty, you'd answer those questions yes or no and let the chips fall where they may?*

Veniremember: *Yes.*

Defense Counsel: Is that correct?

Veniremember: *That is true. It will be very unpleasant, but I will do it.*

\* \* \* \* \* \*

Prosecutor: ... I assume ... that your feeling against the death penalty would affect your deliberation how to answer those [statutory punishment issues].

Veniremember: Yes.

Prosecutor: It would?

Veniremember: Yes.

\* \* \* \* \* \*

Prosecutor: If that's the case, I take it that you could not state under oath that the mandatory penalty of death would not affect your deliberations in the punishment part?

Veniremember: Now, I understand what you are saying. I could not take that.

Prosecutor: You couldn't take that oath?

Veniremember: No. I couldn't do that.

At the conclusion of the veniremember's testimony, the trial judge sustained the State's challenge for cause. *Id.* at 562. We held the exclusion was improper under *Witherspoon* and *Adams:*

... [The veniremember] could not have been excluded consistently with *Witherspoon.* He repeatedly stated that he could follow the law and convict upon proper evidence of guilt beyond a reasonable doubt, despite his opposition to the death penalty.

\* \* \* \* \* \*

This exclusion of [the veniremember] was precisely the kind of exclusion forbidden by the Supreme Court in *Adams.* If even one juror is improperly excluded under the *Witherspoon* line of cases, the State cannot execute an appellant. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339.

*Id.* at 563.

In *Durrough,* 620 S.W.2d at 140, the veniremember testified she had conscientious scruples against the death penalty:

Trial Judge: Does that mean you could not in a proper case if you felt the facts warrant it, vote for a verdict that would result in the Death Penalty being inflicted?

Veniremember: I don't think in all consciousness [sic] I could.

Trial Judge: I can't hear you?

Veniremember: I don't think in all consciousness [sic] I could vote for someone

to, for me to inflict death on any human being. I don't think I could.

Trial Judge: All right. Are you saying that you couldn't do this in any case, regardless of the facts?

Veniremember: I don't think I could. No.

After an explanation of the Texas statutory punishment issues, the veniremember testified:

Defense Counsel: Okay. Now, could you decide those [punishment issues] based on the evidence and follow the law in that respect?

Veniremember: *I could follow the law* but I would still feel responsible. Morally responsible.

Defense Counsel: Well, I feel you might feel morally responsible but what I'm asking you however you feel in the end when it's all over, *could you follow the law and answer those questions based only on the evidence?*

Veniremember: *Yes. I could.*

\* \* \* \* \* \*

Defense Counsel: [C]ould you ... be a juror and make or base your decision only on the evidence, that's it?

Veniremember: *I could* but I would still like I said, I would still feel morally responsible. I really would. I will I would still feel morally responsible.

At the conclusion of the veniremember's testimony, the trial judge sustained the State's challenge for cause. *Id.* at 142. We held the exclusion was improper under *Adams:*

It does not appear from the record that [the veniremember] was so irrevocably opposed to capital punishment that she could not follow the law or obey the instructions of the trial court. To the contrary Scott repeatedly stated that she could answer the questions put to her based on the evidence presented at the punishment phase of the trial. We conclude that V.T.C.A. Penal Code, Section 12.31(b) was applied by the trial court in the instant case to exclude a prospective juror whose only fault was to acknowledge honestly that she had conscientious scruples against

capital punishment and that the mandatory penalty of death or imprisonment for life might affect her deliberations. On this state of the record to hold that the exclusion for cause of [the veniremember] from jury service contravened the Sixth and Fourteenth Amendments. *Adams v. Texas,* [citation omitted].

*Id.*

■ As exemplified by *Cuevas* and *Durrough,* we have consistently held that a potential juror may not be challenged for cause based upon his views about capital punishment unless those views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams,* 448 U.S. at 45, 100 S.Ct. at 2526. In other words, unless a veniremember is so irrevocably opposed to capital punishment that he could not follow the law or obey the instructions of the trial court, he is not disqualified from jury service. *Durrough,* 620 S.W.2d at 142.

### III. *Facts of the Present Case*

■ In the present case Brown testified she strongly opposed the death penalty and could not participate in a proceeding in which the death penalty was handed down. However, after an explanation of the Texas statutory punishment issues, Brown testified as follows:

State: I want you to assume at this point that you are a juror in a capital murder case and that the jury has returned a verdict of guilty, and you are now deliberating punishment. The State has brought you evidence that has convinced [you] beyond a reasonable doubt that the answer to each of those questions should be yes, based upon the evidence that you have heard. Now, I want to remind you that you have taken an oath that you will render a true verdict based upon the law and the evidence. *So, if you followed your oath, you would answer yes, would you not, to each of those questions?*

Brown: *Yes.*

State: But because of your religious, moral objections to the death penalty, you would be sentencing that Defendant to death, would you not, if you answered yes?

Brown: Yes.

State: You would, of course, then be asked, or forced, if you followed your oath, to sacrifice those moral, religious and personal feelings, would you not?

Brown: Yes, I would.

State: *Could you do that?*

Brown: *I guess I would have to.*

* * * * * *

State: Knowing that you have deep-seated religious beliefs against the death penalty ... *would those feelings prevent you, or substantially impair your ability to follow your oath as a juror and render a verdict based upon the evidence and the law as given to you?*

Brown: *No.*

State: *They would not?*

Brown: *(Shaking head.)*

State: *In other words, you're willing to sacrifice those beliefs?*

Brown: *Yes.*

State: *You would give up those beliefs, as deep-seated as they are?*

Brown: *Yes.*

* * * * * *

When questioned by appellant the following exchange occurred.

Appellant: The first [statutory punishment issue] comes to the jury and it says: Was the conduct of the Defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result ... And *if you believe from the evidence that this question should be answered yes, could you answer yes?*

Brown: *Yes.*

Appellant: All right. Special issue Number 2 talks about whether or not there's a probability that the Defendant ... would commit criminal acts of violence that would constitute a continuing threat to society ... *[I]f that had been proven to you beyond a reasonable doubt ... could you answer yes to that question?*

Brown: *Yes.*

Appellant: And we're not sure about [statutory punishment issue] Number 3. We don't know if in the facts in this case would come up, but it could very well come up in a certain type of case. And that is: If the conduct of the Defendant, in killing the deceased, was unreasonable in response to the provocation, if any, by the deceased ... *[I]f there was enough evidence to convince you beyond a reasonable doubt that this question should be answered yes, could you answer that question yes?*

Brown: *Yes.*

At the conclusion of Brown's testimony, the trial judge sustained the State's challenge for cause, over appellant's timely objection. In support of his ruling, the trial judge stated:

Gentlemen, on the State's challenge, *in view of the juror's repeated statements of moral and personal religious opposition to the death penalty,* and on the Court's finding that, taken at best, the juror would have to overcome her moral and religious personal prejudice against the death penalty in order to perform her duty, the Court feels that the juror's views; personal, religious and moral, with regard to the death penalty, would substantially impair the performance of her duties as a juror if selected, the Court will sustain the challenge for cause. . . .

## IV. *Application*

*Adams* and its progeny control the resolution of this point of error. In comparing Brown's testimony to that of Ferguson and White in *Adams,* it is clear to us Brown was a qualified juror. The *Adams* Court held

Ferguson and White were qualified jurors despite their inability to unequivocally state they could answer the statutory punishment issues according to the evidence.[5] Brown, however, consistently and unequivocally stated she could answer the statutory punishment issues affirmatively if proven beyond a reasonable doubt. Because Brown's testimony is even less questionable than Ferguson's and White's, it is clear Brown was excluded on a "broader basis than [her] inability to follow the law. . . ." in violation of the Sixth and Fourteenth Amendments. *Adams,* 448 U.S. at 48, 100 S.Ct. at 2528.

Our holdings in *Cuevas* and *Durrough* also support this conclusion. Like the veniremembers in *Cuevas* and *Durrough,* Brown expressed her opposition to the death penalty but stated she could set aside her feelings and reach a verdict based solely on the evidence. Despite her feelings towards the death penalty, Brown was not so "irrevocably opposed" to capital punishment as to be unable to follow the law in reaching a verdict. *Durrough,* 620 S.W.2d at 142.[6]

Finally, our conclusion of Brown's improper exclusion is supported by the trial judge's own words when ruling on the State's challenge to Brown. The trial judge clearly stated he was excluding Brown because of her "moral and personal religious opposition to the death penalty." This action was improper because Brown testified that she would not disobey the law or the jury instructions by answering the statutory punishment issues negatively in order to avoid rendering the death penalty. *Durrough* 620 S.W.2d at 142. The fact that Brown's views on the death penalty *could* have affected her performance was not sufficient grounds to disqualify her. *Adams,* 448 U.S. at 47, 100 S.Ct. at

---

**5.** At the end of White's testimony in *Adams,* she stated she could *not* set aside her feelings concerning the death penalty and answer the statutory punishment issues honestly. Ferguson never unequivocally stated he could answer the statutory punishment issues affirmatively if the evidence supported it.

**6.** This case is to be distinguished from cases in which the veniremember never asserts she can follow the law and answer the statutory punishment issues accordingly, or when the veniremember is "unwavering in her opposition to the

death penalty." *Callins v. State,* 780 S.W.2d 176, 196 (Tex.Cr.App.1986).

This is also not the case where a veniremember is challenged due to her "vacillation" regarding her feelings on the statutory punishment issues. *Farris v. State,* 819 S.W.2d 490 (Tex.Cr.App. 1990). In such a case, the trial judge's rulings should be given great deference on appeal because only he "is in [the] unique position to determine whether those same feelings would prevent or substantially impair the venireperson's performance as a juror." *Id.* at 501.

2527. A veniremember may not be excluded from jury service based solely on his opinion of the death penalty when the record clearly demonstrates he is capable of following the law. *Adams*, 448 U.S. at 49, 100 S.Ct. at 2528; *Cf. Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (uncertainty in the record due to ambiguous questions as to whether a veniremember's views would "interfere" with her role as a juror requires deference to the trial judge's ruling on qualification).

For the foregoing reasons, we sustain appellant's sixth point of error. The judgment is reversed, and this case is remanded to the trial court.

MILLER, J., dissents.

CAMPBELL, J., dissents for the reason that the venireperson exemplified the responses of a classic, vacillating juror as explicated in *Wainwright v. Witt.*

McCORMICK, P.J., and WHITE, J., join this note.

### OPINION ON STATE'S MOTION FOR REHEARING

CLINTON, Judge.

On original submission in this cause we sustained appellant's sixth point of error, and reversed his conviction. In that point of error appellant argued that the State's challenge for cause against venireman Bulah Brown was erroneously granted. We held that the trial court had indeed erred to exclude Brown from jury service because the excusal was predicated upon nothing more than her moral and religious scruples against the death penalty. In so holding we placed principal reliance upon *Adams v. Texas*, 448

U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and two cases out of this Court, *Cuevas v. State*, 641 S.W.2d 558 (Tex.Cr.App. 1982) and *Durrough v. State*, 620 S.W.2d 134 (Tex.Cr.App.1981). In its motion for rehearing, the State now contends that we erred on original submission in failing adequately to account for the subsequent opinion from the United States Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The State also complains that we have effectively overruled our own opinions in such cases as *Farris v. State*, 819 S.W.2d 490 (Tex.Cr.App.1990), *Vuong v. State*, 830 S.W.2d 929 (Tex.Cr.App.1992), and *Gunter v. State*, 858 S.W.2d 430 (Tex.Cr.App. 1993). We granted the State's motion for rehearing in order to address these contentions.

Venireman Brown frankly acknowledged she did not believe in the death penalty. She opined, "I say God put people on this earth to live, not for other folks just to do away with their lives. If they should die, He will do it." She agreed that she "personally could not participate in any proceeding that ultimately decreed and handed down a death sentence." After the special issues were explained to her, however, Brown was asked whether she could answer them affirmatively if the evidence called for it, despite her misgivings about the death penalty. She responded that if she had taken an oath to do so, she would "have to" sacrifice her conscientious objections to the death penalty, and answer the special issues in accordance with the evidence. She testified unequivocally that her opposition to the death penalty would not substantially impair her ability to follow her oath and render a true verdict.[1]

---

1. On this score Brown testified:
   "Q. Knowing that you have these deep-seated religious beliefs against the death penalty, and you have told me that you do not believe in it, if you were to serve as a juror in this case, would those feelings prevent you, or substantially impair your ability to follow your oath as a juror and render a verdict based upon the evidence and the law as given to you?
   A. No.
   Q. They would not?
   A. (Shaking head.)
   Q. In other words, you're willing to sacrifice those beliefs?

   A. Yes.
   Q. You would give up those beliefs, as deep-seated as they are?
   A. Yes."
   The State points to the following voir dire testimony that occurred shortly after the above as evidence that Brown in fact did believe she would be substantially impaired, notwithstanding the above:
   "Q. All right. And if you took that oath it would be very difficult for you to live up to it, because of those feelings and values, would it not?
   A. Yes, it would.

Although Brown admitted that this scenario would create a "deep conflict between what [she] would be required to do as a juror and what [her] personal feelings regarding the death penalty were," and that affirmative answers would effectively "violate [her] moral and religious beliefs," she never wavered in her assurances that she could nonetheless give affirmative answers to the special issues if the evidence convinced her beyond a reasonable doubt they should be so answered. In this respect, she neither equivocated nor vacillated.

On original submission we pointed out that, like the veniremen in *Cuevas* and *Durrough*, both supra, venireman Brown stated unequivocally that she could set aside her scruples against the death penalty and answer the questions honestly in accordance with the evidence. As with venireman Ward in *Cuevas*, we held that Brown was not challengeable for cause in spite of acknowledging "that under no circumstances could [she] participate as a juror in returning a verdict that would require the court to assess the death penalty." Maj. op. at 293, quoting *Cuevas*, 641 S.W.2d at 560. To hold otherwise, we reasoned on original submission, would violate the prohibition in *Adams* against excusing veniremen "on any broader basis than their inability to follow the law or abide by their oaths[.]" 448 U.S. at 48, 100 S.Ct. at 2528, 65 L.Ed.2d at 591 (internal quotation

marks omitted). Accordingly, we reversed appellant's conviction and remanded the cause.

The State argues that we have failed to take into account the entire voir dire examination of venireman Brown. Examining that voir dire in its entirety reveals, contends the State, that Brown had "conflicting feelings regarding the law," and under those circumstances the appellate court should defer to the trial court's ruling. *Gunter v. State,* supra, at 444, quoting *Farris v. State,* supra, at 501. Unless we have overruled *Gunter* and *Farris sub silentio,* maintains the State, we have erred to reverse the instant conviction. And to overrule those cases, the State submits, would be inconsistent with the Supreme Court's opinion in *Wainwright v. Witt,* supra. Although we believe our opinion in *Gunter* is distinguishable on its facts, we agree with the State that our disposition on original submission is inconsistent with our opinion in *Farris.* However, for reasons about to be given, we believe *Farris* was wrongly decided, *Wainwright v. Witt* notwithstanding, and hereby expressly overrule it.

In *Wainwright v. Witt,* supra, the Supreme Court laid to rest the infamous footnote 21 from *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which had been construed to require that as a predicate to exclusion of a venire-

Q. Would it impair your ability to live up to that oath?
A. Impair my ability?
Q. Uh-huh.
A. What you mean?
Q. Would it make it difficult for you to live up to that oath?
A. Yes.

\* \* \* \* \* \*

Q. It would therefore be very difficult for you, and you would have to sacrifice those moral beliefs, moral beliefs, if you were to fulfill your duty under your oath, wouldn't it?
A. Yes.
Q. And I take it then that your ability to perform that oath would be made most difficult by your religious and moral feelings?
A. Yes.
Q. And that your duty as a juror, and your performance as a juror, would be in direct conflict with those deep-seated religious and moral feelings?
A. Yes.

Q. Ms. Brown, I think I understand exactly how you feel. I think you have made your position very clear. I'm going to go one step further with you.
  Knowing what your answers of yes would be to those questions; that is, that the death penalty would be inflicted on the Defendant, in all good conscience, all good conscience, recognizing your moral and religious beliefs, is there any way that you could vote yes and not violate your moral and religious beliefs?
A. I don't think so."

That Brown would find her task as a juror more difficult, or that it would violate her conscience to answer special issues affirmatively when the evidence called for it, knowing it would result in the death penalty, does not establish she could not do it, or even that she would be substantially impaired in doing it. In fact, she maintained throughout, whenever asked directly, that she would not be substantially impaired, and that she could and would sacrifice her conscience if called upon as a juror, however difficult that might be.

man on the basis of conscientious scruples against the death penalty, a state must demonstrate with "unmistakable clarity" that the venireman would "automatically" reject the possibility of imposing a sentence of death. In its stead the Supreme Court solidified the standard announced in *Adams v. Texas,* supra, *viz:* that a venireman may be challenged consistent with the Sixth Amendment upon a finding that his opposition to the death penalty would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Of course, the Supreme Court had already made it clear in *Adams* itself that whatever reservations a venireman might harbor toward the death penalty could not justify excluding him, even under the "substantial impairment" standard, so long as he maintains unswervingly that his reservations will not prevent him from answering the special issues to the best of his ability in accordance with the evidence, without conscious distortion or bias. A venireman who can do this is a venireman who can do all that the law requires.[2] From the time the operation of the special issues was explained to her, venireman Brown steadfastly maintained she could take the oath and answer the special issues honestly, according to the evidence, even though to do so would violate her conscience. The record thus establishes she could follow the law; there is no basis to support a conclusion otherwise. Our holding on original submission is therefore fully in keeping with the standard announced in *Adams* and reiterated in *Witt.*

The State argues, however, that we have failed to give the deference that is due the trial court's conclusion that the venireman was substantially impaired.[3] According to the State, we did not take account of the entirety of Brown's voir dire, and had we done so, we would have found ample support in the record for the trial court's conclusion that she was substantially impaired. In particular, we failed to effectuate Brown's statement that she could never participate in a proceeding that might eventually result in imposition of the death penalty, her frank and consistent acknowledgments that to follow her oath and answer the special issues honestly would, if her answers were affirmative, violate her moral and religious beliefs, and her failure to accept that death might ever be an acceptable penalty. At best Brown was, in the State's assessment, a vacillating venireman. Under the aegis of *Wainwright v. Witt,* supra, this Court has long deferred to a trial court's judgment about vacillating veniremen, whether that judgment is that the venireman is substantially impaired or that he is not. E.g., *Perillo v. State,* 758 S.W.2d 567, at 577 (Tex.Cr. App.1988). The State believes we have violated that principle here. We disagree.

■ It is true that Brown affirmed in response to leading questions that she could never participate in a proceeding that might result in imposition of a sentence of death. These leading questions came, however, before it was ever explained to Brown how the sentence of death is imposed in Texas.

2. At the time of appellant's trial, in 1988, Article 37.071(b) required the jury at the punishment phase of a capital case to answer two, and sometimes three special issues. The jury's function was purely that of a factfinder, to determine whether the accused acted deliberately, was a continuing threat to society, and acted unreasonably in response to provocation, if any. The law required jurors who could serve this factfinding function without conscious distortion or bias. It required nothing more. A juror with conscientious scruples against the death penalty who could nevertheless answer the special issues honestly and in accordance with the evidence was a juror who could follow the law. Whether the same can be said of such a juror under the current statutory regime is an open question. See n. 4, *post.*

3. The State complains that we distorted the record in our opinion on original submission when we pointed out that the trial judge "clearly stated that he was excluding Brown because of her 'moral and personal religious opposition to the death penalty.'" Maj. op. at 296–297. The State makes a legitimate point here, for the trial judge just as clearly went on to state for the record that it was because he believed that Brown's opposition "would substantially impair the performance of her duties as a juror" that he granted the State's challenge for cause. Whatever the implication of our opinion on original submission, we do not now hold that the trial court failed to use the proper standard in judging the validity of the State's challenge for cause. Rather we hold, *post,* that the record does not support the trial court's judgment that Venireman Brown was substantially impaired.

From the time it was explained to her that the jury simply responds to special issues at the punishment phase, she acknowledged that even though it would be "difficult," and that it would clearly "violate her moral and religious beliefs," she would answer the special issues "yes" if the evidence called for it. That it would be difficult, or even that it would unquestionably violate her conscience, however, does not lend support to a finding that Brown was substantially impaired, for this is no more than a simple acknowledgment that her attitude toward the death penalty would "affect" her deliberations. *Adams v. Texas,* supra, 448 U.S. at 49–50, 100 S.Ct. at 2528–2529, 65 L.Ed.2d at 592–93. So long as she consistently affirmed that she could in fact answer the special issues in accordance with the evidence, neither the difficulty she may have in doing so, nor the fact it might violate her conscience, renders her a "vacillating" venireman in any material sense. The dispositive question under *Adams* is simply whether she could follow the law, notwithstanding her staunch opposition to the death penalty. In that, Brown was unyielding—she could.

The State insists that our conclusion that Brown was not a vacillating venireman is at odds with our dispositions in *Gunter* and *Farris.* In *Gunter,* however, venireman Frede first stated she could not answer the special issues affirmatively even if the evidence convinced her she ought to. Later she answered that she could. Because she gave conflicting answers to what after *Adams* must be considered the dispositive question, Frede was truly a vacillating venireman. Under those circumstances it is only appropriate to defer to the trial court's judgment. See *Perillo v. State,* supra. Our resolution of this cause on original submission is thus not inconsistent with the result, at least, in *Gunter.*

But our opinion in *Gunter* did rely in large measure for authority on *Farris,* and *Farris* is another story. In *Farris* venireman Goodson testified she could never "return a verdict which assessed the death penalty." Acknowledging that it would violate her conscience to do so, Goodson nevertheless insisted she would not violate her oath to render a true verdict, and unambiguously and unwaveringly insisted she would answer the special issues honestly and in accordance with the evidence. Thus, in every material aspect her voir dire testimony was identical with venireman Brown's in the instant cause. Yet in *Farris* we observed that Goodson "vacillated." 819 S.W.2d at 501. And in *Gunter* we again described Goodson as having been a vacillating venireman, and observed that deference to the trial court was the proper course in the premises. 858 S.W.2d at 443–44. Manifestly the State is correct that our opinion on original submission in this cause is in conflict with our opinions in *Gunter* and *Farris,* notwithstanding our footnote 6, maj. op. at 296, in which we purported to distinguish *Farris.* We now recognize that we must either follow *Farris* or forsake it.

■■ We cannot follow it. A venireman who unflinchingly insists she can answer the special issues according to the evidence does not "vacillate" when she frankly acknowledges that to do so will violate her conscience should she have to answer the questions in a way that assures death will be imposed. To defer to the trial court's judgment that such a venireman is substantially impaired is to give the trial court carte blanche to excuse her on the basis of nothing more than what *Farris* characterized as "conflicting feelings regarding the law, the juror's oath, and capital punishment[.]" 819 S.W.2d at 501. If *Adams* makes anything clear, it is that "conflicting feelings" about the death penalty do not disqualify the venireman who is able to put those feelings aside and impartially serve the simple factfinding function called for under the special issues. To allow a State's challenge for cause on any broader basis than the venireman's ability to find facts, as the late Judge Teague put it in his dissenting opinion in *Farris,* supra, at 508, "simply will not do." Of course we defer to the trial court's judgment when confronted with a record that reveals true equivocation or vacillation on the question whether, despite conscientious scruples against the death penalty, a venireman can abide by and follow the law. *Wainwright v. Witt,* supra; *Perillo v. State,* supra. But a venireman such as Brown, who steadfastly insists she can follow the law irrespective of the damage it may do her

conscience, leaves nothing to the discretion of the trial court, for she has provided no basis to conclude she is challengeable for cause.

In another context Judge Teague observed that, consistent with *Adams,* "[a] juror may not be excluded merely because there is difficulty in resolving questions of fact, even when that difficulty is exacerbated by a sensitive conscience. Only when there is a substantial likelihood that he will balk at the task or falsify an answer should he be judged unqualified." *Hernandez v. State,* 757 S.W.2d 744, at 752–53 (Tex.Cr.App.1988) (Plurality opinion). The *Farris* Court dismissed *Hernandez* in a footnote. 819 S.W.2d at 501–502, n. 3. Later, in *Fuller v. State,* 829 S.W.2d 191, at 200 (Tex.Cr.App.1992), the Court consigned *Hernandez* to oblivion. We now expressly overrule our holding in *Farris,* disapprove of our reliance upon *Farris* in *Gunter,* and resurrect the above principle from *Hernandez.* Brown gave no indication she would "balk" at the prospect of taking her oath, nor that she might falsify answers to the special issues to protect her conscience. The record presents no basis for the trial court to conclude she was substantially impaired, and its conclusion that she was constituted an abuse of discretion. Under these circumstances it would be anomalous, to say the least, to defer to the trial court, *Wainwright v. Witt* notwithstanding.

■ Finally, the State argues that reversal of this cause is inconsistent even with the language of *Adams* itself. It is true that in *Adams* the Supreme Court observed in passing that in order to be able to follow the law in Texas a venireman in a capital case must be able, *inter alia,* "to accept that in certain circumstances death is an acceptable penalty[.]" 448 U.S. at 46, 100 S.Ct. at 2527, 65

L.Ed.2d at 590. But as Judge Teague cogently explained in *Hernandez,* supra, at 752, n. 16, the Supreme Court to this extent has simply mischaracterized Texas law. Under former Article 37.071, V.A.C.C.P., any venireman who could answer the special issues according to the evidence, without conscious distortion or bias, could follow the law, irrespective of his willingness to "accept" the death penalty in the abstract. See n. 2, *ante.* As long as his rejection of the death penalty, however categorical, did not substantially impair his ability to abide by his oath to render a true verdict, it did not make him challengeable for cause under our law. "He need not himself favor the penalty under any circumstances." *Hernandez,* supra at 752.[4]

The State's motion for rehearing is overruled.

CAMPBELL, J., dissents.

### DISSENTING OPINION ON STATE'S MOTION FOR REHEARING

WHITE, Judge, dissenting.

I dissent to the majority's decision to overrule the State's motion for rehearing in the instant cause, to the majority's decision to overrule this Court's holding in *Farris v. State,* 819 S.W.2d 490 (Tex.Cr.App.1990), and to the majority's disapproval of this Court's reliance upon *Farris* in *Gunter v. State,* 858 S.W.2d 430 (Tex.Cr.App.1993).

In its motion for rehearing, the State argues "a review of Brown's entire testimony reveals she testified that her opposition to the death penalty would prevent her from participating in any proceeding in which the death penalty was assessed, stated that her views would impair her ability to follow her

4. Under the current version of Article 37.071, supra, it is arguable that categorical opposition to the death penalty can support a trial court's conclusion that a venireman is "substantially impaired" under *Wainwright v. Witt,* supra, at least if that opposition would cause the venireman invariably to answer the special issue required to be submitted by subsection (e) in such a way as to prevent imposition of the death penalty. Cf. *Staley v. State,* 887 S.W.2d 885 (Tex.Cr.App., 1994) (rehearing denied September 21, 1994) (venireman who maintained his categorical op-

position to death penalty would cause him invariably to answer jury nullification instruction in satisfaction of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), in such a way as to prohibit imposition of death sentence was properly subject to State's challenge for cause). But under the capital punishment regime in effect at the time of appellant's trial, in 1988, a juror had only to find facts without conscious distortion or bias. He need not have been willing to "accept" the death penalty at all in order to be capable of following the law.

oath, and indicated she was not willing to accept that in certain circumstances death is an acceptable penalty." The State contends this Court's decision on original submission "cannot be squared with this Court's previous decisions," citing *Gunter v. State, Vuong v. State,* 830 S.W.2d 929 (Tex.Cr.App.1992); and *Farris v. State;* among others. The majority, conceding that Brown's voir dire in the instant cause cannot be distinguished from the voir dire of venireperson Goodson in *Farris,* resolves the State's contention by overruling our holding in *Farris* and claiming that *Gunter* is distinguishable on the facts.

I disagree with the majority's assessment of the voir dire of Brown in the instant case and of Goodson in *Farris,* and the comparison to the voir dire in *Gunter.* In each of these cases, the record of the testimony of the venirepersons in question revealed their conflicting answers which demonstrated their equivocation, vacillation and uncertainty. In our review of the records of these three cases, we are obligated to "defer to the trial judge who had the opportunity to observe and evaluate components that are insightful to the juror's views but which are not reflected on the face of the record, such as demeanor, inflection, and expression." *Cooks v. State,* 844 S.W.2d 697, at 713–715 (Tex.Cr.App.1992).

A method of review, as set out in *Gunter, Farris, Vuong* and *Cooks,* would be in line with the precedent set by the Court in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). When faced with a record where a venireperson has given conflicting answers, thereby demonstrating equivocation, vacillation or uncertainty, this Court should grant considerable deference to the decision of the trial court who had the opportunity to directly observe the demeanor of the venireperson. Until today, this has been the method relied upon by this Court. See *Goodwin v. State,* 799 S.W.2d 719, at 731 (Tex.Cr.App.1990); *Farris v. State,* 819 S.W.2d at 501; *Vuong v. State,* 830 S.W.2d at 943, and cases cited therein; *Cooks v. State,* 844 S.W.2d 697, at 713–715; and *Gunter v. State,* 858 S.W.2d at 443.

The majority's decision today represents not only a breach of stare decisis, but a return to the days when this Court engaged in appellate re-evaluation of voir dire records in a dangerous revisionist approach to the assessment of the rulings of trial courts. In those days this Court chose to ignore what it personally could not witness or evaluate: the credibility and demeanor of the members of a venire. Instead this Court exalted the superiority of cold, one-dimensional records of voir dire proceedings above any deference to the position and experience of the members of the trial bench. With its decision to return to those days, the majority usurps the authority of trial courts to assess the ability of venirepersons to perform their duties.

The majority's decision creates problems for trial courts. They are now faced with the prospect of our being predisposed to second-guess their decisions on voir dire. No matter what degree of equivocation and conflict exists in the answers, demeanor, inflection, and expression of a venireperson, no matter how much these factors convince the trial court that the venireperson would be substantially impaired in his performance of his duties as a juror in accordance with his oaths and instructions, if the record reveals even one hesitant, assenting nod to a question of whether the venireperson could follow his oath, this Court will, on its own, rule that venireperson to be acceptable and hold any ruling otherwise to be in error.

For these reasons, I respectfully dissent to the majority's decision to overrule the State's motion for rehearing.

McCORMICK, P.J., and MILLER, J., join this dissent.