**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 97-10864**
_____

**TROY DALE FARRIS,**

**Petitioner-Appellant,**

**versus**

**GARY L. JOHNSON, DIRECTOR, TEXAS DEPARTMENT**
**OF CRIMINAL JUSTICE, INSTITUTIONAL**
**DIVISION,**

**Respondent-Appellee.**

**Appeal from the United States District Court**
**for the Northern District of Texas**
**(4:94-CV-142-Y)**

**April 27, 1998**

Before JOLLY, DUHÉ, and BARKSDALE, Circuit Judges.

PER CURIAM:[1]

Troy Dale Farris, convicted in Texas state court of capital murder and sentenced to death, appeals the denial of habeas relief, claiming that the district court erred in applying a presumption of correctness to the trial court's determination that prospective juror Janice Goodson was excludable for cause, in the light of the Texas Court of Criminal Appeals, in a decision in another case,

---

[1]    Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

overruling its earlier decision in Farris' direct appeal on that issue; and that his court appointed counsel labored under an actual conflict of interest due to their professional affiliation with an attorney who was formerly the lead prosecutor assigned to his case. We **AFFIRM**.

I.

Farris was convicted by jury in May 1986 of the offense of capital murder for the shooting death of Tarrant County Texas Deputy Sheriff Clark Rosenbalm. (The facts underlying the murder are not at issue.) Following a separate punishment hearing, the jury affirmatively answered two special issues that were presented; and, accordingly, the trial court sentenced Farris to death.

On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence. *Farris v. State*, 819 S.W.2d 490 (Tex. Crim. App. 1990), *cert. denied,* 503 U.S. 911 (1992), *overruled by Riley v. State*, 889 S.W.2d 290, *aff'd on rehearing*, 889 S.W.2d 297 (Tex. Crim. App. 1994), *cert. denied,* 515 U.S. 1137 (1995).

Farris then filed for state habeas relief. The trial judge conducted the state habeas proceeding; following an evidentiary hearing, the court, in August 1993, entered findings of fact and conclusions of law, and recommended that habeas relief be denied. The Texas Court of Criminal Appeals adopted the trial court's finding and denied habeas relief in December 1993. *Ex parte*

***Farris***, No. 15,938-02 (Tex. Crim. App. Dec. 15, 1993) (unpublished order).  Execution was set for 8 March 1994.

On 2 March 1994, Farris sought federal habeas relief and a stay of execution; a stay was granted on 4 March.  And, at the end of 1994, while Farris' federal habeas petition was pending, the Texas Court of Criminal Appeals rendered ***Riley v. State***, 889 S.W.2d 290, *aff'd on rehearing*, 889 S.W.2d 297 (Tex. Crim. App. 1994), *cert. denied,* 515 U.S. 1137 (1995), which expressly overruled its prior opinion in Farris' appeal on the issue of whether venireperson Goodson was properly excluded for cause.

In early 1997, the magistrate judge recommended granting habeas relief to Farris with respect to Goodson's exclusion, while recommending denying relief on all other issues.  But, in June 1997, the district court denied habeas relief as to all claims; nevertheless, it granted a certificate of probable cause to appeal. ***Farris v. Johnson***, 967 F. Supp. 200 (N.D. Tex. 1997).  Farris moved to amend the judgment; in July 1997, in the light of the Supreme Court's decision in ***Lindh v. Murphy***, ___ U.S. ___, 117 S.Ct. 2059 (1997), the district court amended the denial order by applying the standards of 28 U.S.C. § 2254 as existed prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). (The district court later granted Farris an AEDPA certificate of appealability. But, as the district court ruled, pre-AEDPA law applies.)

Farris claims that the district court erred in according a presumption of correctness to the trial court's finding that Goodson was excludable for cause due to her position regarding the death penalty. For his second, and only other, issue, he maintains that his court appointed counsel labored under an actual conflict of interest due to their professional affiliation with the former lead prosecutor on Farris' case, who resigned from the district attorney's office prior to Farris' trial and formed a professional relationship with his trial counsel.

Of course, under pre-AEDPA habeas law, "[i]n considering a federal habeas corpus petition presented by a prisoner in state custody, federal courts must generally accord a presumption of correctness to any state court factual findings." **Mann v. Scott**, 41 F.3d 968, 973 (5th Cir. 1994), *cert. denied,* 514 U.S. 1117 (1995). Of particular application here, as stated in **Wainwright v. Witt**, 469 U.S. 412, 429 (1985), a state trial judge's decision to strike a juror because of his views on capital punishment is a factual finding entitled to the presumption of correctness found in 28 U.S.C. § 2254(d). (All references in this opinion to § 2254(d) are to that section as it existed prior to amendment by AEDPA). However, "[e]ight exceptions exist to this presumption. One of the exceptions is if the record does not fairly support the finding. If the record as a whole does not fairly support the finding, the

- 4 -

finding is not entitled to the presumption of correctness." *James v. Whitley*, 39 F.3d 607, 609-10 (5th Cir. 1994), *cert. denied,* 514 U.S. 1069 (1995); *see also Gilley v. Collins*, 968 F.2d 465, 469 (5th Cir. 1992) (although findings of fact are entitled to a presumption of correctness, this court is not bound by those findings if the state finding is not fairly supported by the record).

It goes without saying that we review a district court's findings of fact for clear error; issues of law, *de novo. E.g., Mann*, 41 F.3d at 973 (citing *Barnard v. Collins*, 958 F.2d 634, 636 (5th Cir. 1992), *cert. denied*, 113 S. Ct. 990 (1993)). And, needless to say, "[a] finding of fact made by the district court is clearly erroneous only when the reviewing court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *Williams v. Collins*, 16 F.3d 626, 630 (5th Cir.), *cert. denied,* 512 U.S. 1289 (1994).

A.

In asserting that the district court erred in according a presumption of correctness to the trial court's findings in excluding Goodson, Farris contends that, instead, the presumption should be applied to *Riley v. State,* which overruled *Farris v. State* on the issue of whether Goodson was properly excluded. He maintains also that Goodson's exclusion was based on an application

- 5 -

of an improper legal standard; and that the decision to exclude her was without support in the record.

On direct appeal, in affirming Farris' conviction and sentence, the Texas Court of Criminal Appeals rejected the contention that Goodson was excluded improperly because of her capital punishment views:

> [W]e find Goodson established, via her juror questionnaire form and later upon examination, that she could not impose the death penalty under any circumstances. She also stated that she would not "deliberately" find appellant "not guilty" because of her opposition to the death penalty. On the more critical issue of the three questions at punishment, Art. 37.071(b), however, Goodson vacillated. Pursuant to questioning by the State, defense counsel, and the trial judge, Goodson stated, among other things, she was opposed to capital punishment under any circumstances, that she could answer affirmatively the special issues if the facts warranted, but that it would violate her conscience to vote yes on the issues "in the proper case and the proper evidence". Goodson understood her responsibilities as a juror and said she would not violate her oath, but she also stated she did not agree with the law and if she were selected as a juror she would have no choice but to follow it.
>
> ....
>
> On the basis of these facts, we cannot say the trial judge abused his discretion in granting the State's challenge for cause to venire-person Goodson. When presented with a prospective juror who has conflicting feelings regarding the law, the juror's oath, and capital punishment, the trial judge is in a unique position to determine whether those same feelings would prevent or substantially impair the venire-person's performance as a juror.

*Farris*, 819 S.W.2d at 501.

As noted, approximately three years later, however, while Farris' federal habeas petition was pending, the Texas Court of Criminal Appeals, in *Riley v. State*, revisited *Farris*. In *Riley*, the court, in its original opinion, had held that a prospective juror in Riley's capital murder trial was excused improperly, based solely on her opposition to the death penalty. *Riley*, 889 S.W.2d at 296-97. On rehearing, the court held that its opinion was inconsistent with its holding on this issue in *Farris*, due to the fact that the two cases were factually indistinguishable. As a result, the *Riley* court overruled *Farris* on that issue: "*Farris* was wrongly decided, *Wainwright v. Witt* notwithstanding, and [we] hereby expressly overrule it." *Riley*, 889 S.W.2d at 298. The *Riley* court concluded that Goodson was not a vacillating venireperson, as had been concluded in *Farris*, stating that, despite her objection to capital punishment, Goodson "insisted she would not violate her oath to render a true verdict, and unambiguously and unwaveringly insisted she would answer the special issues honestly and in accordance with the evidence." *Riley*, 889 S.W.2d at 300. The court held that Goodson had been improperly excluded due to her conflicting feelings regarding capital punishment, despite the fact that she stated she could answer the special issues honestly. *Id.*

- 7 -

Because Farris contends that Goodson was improperly excluded, we excerpt her voire dire at considerable length:

> **[BY THE STATE]** Q.  I notice an answer to your questionnaire ... in response to the following question, with reference to the death penalty which of the following statements would best represent your feelings, circle one, and you circled No. 3 and with your signature on the next page or two pages later, I could never under any circumstances return a verdict which assessed the death penalty.  Is that your opinion?
>
> **[BY GOODSON]** A.  Yes, that's the way I feel.
>
> Q.   I beg your pardon?
>
> A.   That's the way I feel, yes.
>
> Q.   I presume then that you are opposed to capital punishment?
>
> A.   Yes I am.
>
> Q.   And I will repeat that question one more time and this is important for the record in this case.  Could you, under any circumstances as a juror in a criminal case, vote to return the death penalty?
>
> A.   No.

Next, counsel for Farris explained in detail to Goodson the procedure for the penalty phase of the trial, including the submission of the special questions, and the role of the jury at that phase of the trial.

> **[BY DEFENSE COUNSEL]** Q.  The question that I have of you is whether or not your feeling about the death penalty is so strong and is so fixed that you feel that you would not be able to answer these factual questions fairly and

truly and honestly without regard for the consequences. That was a long question.

**[BY GOODSON]** A. You are asking me if I feel strongly enough about the death penalty that I would not -- that I would say not guilty, so I wouldn't have to say it; is that what you are saying.

Q. Yes, ma'am. Regardless of what the facts were presented by the State of Texas.

A. No, I would not do that.

Q. You would make up -- we are taking this in two stages.

A. I would try to do the best that I thought the reasonable outcome should be.

Q. Your oath of office as a juror would require you to render a true verdict, and what that means, I can tell you, is to render a verdict based upon the evidence, based upon the facts, not based on what you want to have happen. So at the first stage of the trial you see no difficulty and you could do that? Difficulty is not the right word. You could do that?

A. I would not like to.

Q. Okay.

A. But on the other hand, if I were to be placed in that position --

Q. Uh-huh.

A. -- then I would do the best I could.

Counsel for Farris continued questioning Goodson, once again explaining in detail the procedures of the penalty phase of the proceedings, including the submission of the special questions.

- 9 -

**[BY DEFENSE COUNSEL]** Q. The law requires that these questions be based on evidence that you've heard, just as your guilty verdict has to be based on the evidence and that stands to reason. A trial should be more than guesswork or speculation or what I think maybe [might] have happened.

**[BY GOODSON]** A. Yes.

Q. All right. Does your feeling about the death penalty -- and, you know, what the consequences of yes answers would be and you know what the consequences of no answers would be -- Is your feeling about the death penalty such that you do not feel that you could fulfill the oath of office that you would have to take and answer those questions 1, 2 and/or 3, if 3 were to be given to you, that you could not answer those questions fairly and truly and honestly just as your oath requires you?

A. I can only tell you that I would do my best. That I would not deliberately do otherwise.

Q. Okay. That's --

**[BY THE COURT]** Q. I did not hear. Would not deliberately do what?

**[BY GOODSON]** A. I wouldn't deliberately do otherwise.

At this point, a dispute between the prosecutor and defense counsel over whether Goodson had clearly stated her views on capital punishment resulted in a conference in the judge's chambers. Questioning then resumed by counsel for Farris:

**[BY DEFENSE COUNSEL]** Q. What I was about to try -- and I don't know if being up here is going to help at all. What we have got is we have jurors who have to make the decisions about the facts in the case. They have to

- 10 -

make those decisions based on the evidence and what the law is trying to do by saying that a juror must make those decisions based on the facts, is trying to keep the jurors from jumping the gun, if you will, from going around what the facts are just in order to arrive at a certain outcome. Does that make sense?

**[BY GOODSON]** A.   Yes.

Q.   So the law says this wouldn't be proper for the jurors just to say, well, I am a juror and I get to write in a yes or no up here, but because I want it to come out a certain way, I am just going to disregard the facts; I am not going to pay any attention to the evidence in the case and in order to arrive at a certain outcome I will just answer the questions in a certain way that I know is going to bring about the outcome. The law says that we must go through step-by-step; that the jurors must answer the questions based upon the facts and then the outcome is set out by the law and falls on the Judge. I just want to make sure we don't have any misunderstanding.

A.   You are asking me if I feel strongly enough about the death penalty that if I think he is guilty I am going to say, no, he is not guilty so he doesn't get the death penalty? You are asking me if I would do that?

Q.   Yes, ma'am. That would be at the first stage, yes, ma'am.

A.   I would not deliberately.

Q.   Now at the second stage -- see, your job is not over at the first stage -- At the first stage we decide guilty or not guilty, and at the second stage is when you see these questions. The Judge [will] give you a set of written instructions, and these questions would be in those instruction[s] and the Judge would tell you, answer questions either yes or no, depending on the evidence that you've heard. And if you had heard enough evidence

- 11 -

to convince you beyond a reasonable doubt the law would require you to answer the questions yes. If you had not heard sufficient evidence, the law would require you to answer the questions no. Your obligation is to follow the law at both stages of the trial, and I am sure you can agree with that. Just as you would not automatically vote not guilty to keep somebody from getting the death penalty because that would be contrary to your oath, as I understood your earlier answer you wouldn't automatically vote no to these questions to keep somebody from getting the death penalty because that also would be contrary to your oath. Have I misstated your answer? If I have --

A.   No, that's sound like [sic] what I said.

Q.   No one is asking you to like or dislike the death penalty. No one is asking you to put yourself in the role of judge because that's not your job. Your job as a juror would be to answer the questions, the factual questions, and I take it, regardless of your feelings one way or another that you could do that because that's what your oath requires you to do?

A.   Yes. I wouldn't want to; I wouldn't like to, but I would.

....

Q.   Would you follow the law and would you be able to, in fact, base your decisions upon the facts of the case rather than personal opinion or personal feelings recognizing that that's not the job of the juror? The job of the juror is to base their decisions on the facts.

A.   I would do the best I could.

At this juncture, the court questioned Goodson.

**[BY THE COURT]** Q.   Mrs. Goodson, when you filled out this questionnaire, was it your intention to sign this No. 3 which said, "I

- 12 -

could never under any circumstances return a verdict which assessed the death penalty?" Is that what you said?

**[BY GOODSON]** A.  Yes.

Q.  All right.  Now, as Counsel has told you, if the Defendant is found guilty you will then be asked to answer these three questions yes or no.  If you answer those two or three questions yes, depending on whether the third one is used, you will be assessing the death penalty.  Now, which is proper?  That you could not under any circumstances, as you said here, or can you follow the instructions of the Court and answer these questions yes in the proper case?  Which is it?  Nobody is mad at you.  We just need to know.

A.  The problem I have with that question is that I am not sure that the way it's worded says what it means.

Q.  What are you referring to?

A.  It says under any circumstances.

**[BY DEFENSE COUNSEL]** Q.  Judge, is this the complete questionnaire?  Are you talking about the whole questionnaire?

**[BY GOODSON]** A.  Yes.  It says, would I under any circumstances return the death penalty.  That's what that says and I said no.  Okay.  I didn't understand what that was asking me.  What I understood was if, indeed, that he was found guilty then we were to say, yes, we want the death penalty and would I do that.  That's what I understood.  I did not understand that I would be required to come here and answer questions and decide what I felt was right or not, and that in saying that I thought he was guilty then I would be, in fact, saying that I was for the death penalty.

**[BY THE COURT]** Q.  All right.  Now, well, it still comes back to a situation where the jury might be asked to assess punishment in this case.  They do not assess punishment as it is

- 13 -

done in other type cases, but they are asked to answer those three questions either yes or no, and I think you have surmised from talking to Counsel for each side that if you vote yes to 1, 2 and/or 3 you will have voted to assess the death penalty. Now could you, in a proper case, if the facts warranted, do that?

**[BY GOODSON]** A. I could. I wouldn't want to. I wouldn't want to, but I would.

Q. Would it violate your conscience to vote yes in the proper case and the proper evidence?

A. Yes, it would.

Apparently, (and understandably) still unclear as to Goodson's views, questioning resumed by counsel for Farris.

**[BY DEFENSE COUNSEL]** Q. Let me ask you, Mrs. Goodson, this: Mrs. Goodson, you could follow the law, is that what I understood your answers to be; is that correct? That you don't like being placed in this position and you wouldn't want to do it, but with the full explanation, and I am not talking about that very brief question that was asked on the questionnaire because as you can see by that question it really didn't tell you what the procedure is. It really didn't tell you what all you may be faced with.

**[BY GOODSON]** A. I feel like if I were told that I had to come to the Court and had to listen to the facts and if I listened to those facts and felt like he was guilty then I would not deliberately say, no, he is not. I would not want to be in that position. I would hate very badly to be in that position, but I don't feel like I could do otherwise than what the law says I have to do.

Q. You would follow the law? You wouldn't violate your oath of office?

A. I would not, no.

Q. By the same token, at the second stage you would not violate your oath and automatically vote one way or another? Here again, you would base your answers on the facts?

A. Yes, I will.

Q. Without arguing with the Court or the State's counsel, we feel that Mrs. Goodson is qualified and exactly fills the requirements of the law and she should not be excused and we object to excusing her.

**[BY THE COURT]** Each answer I get from her still goes back to guilt or innocence. I don't think we have got over that point and I would appreciate you working on that area.

....

**[BY GOODSON]** A. I don't know what I can say or maybe I am not understanding what you are asking me, but I don't feel like I can put it any plainer or see it any differently than I already have.

In yet another attempt to clarify Goodson's views, the prosecution once again explained the bifurcated procedure.

**[BY THE STATE]** Q. And did you or did you not circle this question, I could never under any circumstances return a verdict which assessed the death penalty, and you had four choices and you chose that one?

A. Yes, I did.

....

Q. On this page you had the possibility of answering four different questions, and I refer to page 5 of this questionnaire, that you have told and that you have signed and in response to the following question with reference to the death penalty, which of the

- 15 -

following statements would best represent your feelings, circle one. No. 1, I believe the death penalty is appropriate in some cases. You didn't circle that one, did you?

A.    No, I didn't.

Q.    No. 2, although I do not believe that the death penalty should ever be involved so long as the law provides for it I could assess if I believed the facts warranted it, and you didn't circle that one, did you?

A.    No, I didn't.

Q.    No. 3, I could never under any circumstances return a verdict which assessed the death penalty, but you did circle that one, didn't you?

A.    Yes, I did.

Q.    No. 4, none of the above; you didn't circle that one, did you?

A.    No, sir, I didn't.

Q.    Seated right there where you are, I asked you a while ago are you opposed to capital punishment?

A.    Yes, I am.
....

Q.    Did you or did you not answer my question a while ago that you were opposed to capital punishment?

A.    Yes, I am.

Q.    Is that your final answer?

A.    I feel like I have no choice. I mean, I am told that I have to come -- yes, I am told I have to come to this jury and I have to listen to the facts and if I listen to these facts then I have to personally say if I believe he is guilty or not. That's my responsibility. I have no choice, you know, I

- 16 -

really don't want to do it and I don't believe in it and don't want to do it, but if the State of Texas tells me that I have to do it, I have no choice.

Q. Nobody is telling you you have to do anything. That's the reason we have this legal system we have. Nobody is about to ... tell you to do anything.

A. If I am chosen, if I have to come to this jury then I don't have a choice.

Q. You certainly do have a choice. You get a vote.

A. I can say the man is guilty. Well, I believe there is other ways of dealing with that person being guilty than the death penalty.

Q. All right. Let me ask you this: In the State of Texas the law provides that in some cases for a jury to return a verdict of death that's our law, and there is a lot of law that I don't agree with. And if you don't agree with this law, that's all we are asking you. If you will just tell us, you can go home.

A. Pardon me for saying so, but I have said so for several times that I don't agree with it.

After hearing argument from counsel for Farris as to why Goodson should not be stricken, the court, pursuant to the following finding, excused Goodson:

The Court having observed the demeanor of the juror and her answers to various questions, finds her views on capital punishment would prevent *or substantially impair* the performance of her duties as a juror in accordance with her instructions and oath and she is, therefore, discharged and excused from the case.

- 17 -

(Emphasis added.)

As noted, "in a proceeding under [pre-AEDPA] 28 U.S.C. § 2254(d), the trial court's factual determination that a potential juror is disqualified is entitled to a presumption of correctness, absent one of the specifically enumerated exceptions contained [in that section]." *Ellis v. Lynaugh*, 873 F.2d 830, 833 (5th Cir.), *cert. denied,* 493 U.S. 970 (1989).[2]  Such a deferential standard of

---

[2]  Pre-AEDPA 2254(d) provided:

>    In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
>
>        (**1**)  that the merits of the factual dispute were not resolved in the State court hearing;
>
>        (**2**)  that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
>
>        (**3**)  that the material facts were not adequately developed at the State court hearing;
>
>        (**4**)  that the State court lacked jurisdiction of the subject

- 18 -

review, obviously, is especially appropriate for a finding of juror bias because it "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Witt*, 469 U.S. at 428; *see also* ***O'Bryan v. Estelle***, 714 F.2d 365, 392 (5th Cir. 1983), *cert. denied,* 465 U.S. 1013 (1984) (Higginbotham, J., concurring specially) (discussing the justification for the presumption of correctness afforded the trial court's finding of juror bias).

---

matter or over the person of the applicant in the State court proceeding;

(**5**) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(**6**) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(**7**) that the applicant was otherwise denied due process of law in the State court proceeding;

(**8**) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made ... is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record....

1.

But, as noted, Farris contends that this pre-AEDPA § 2254(d) presumption must be applied, instead, to the Texas Court of Criminal Appeals' ruling in **Riley** that Goodson "unambiguously and unwaveringly insisted that she would answer the special issues honestly and in accordance with the evidence"; and that, therefore, she was not a vacillating juror, and thus, was not properly excludable for cause.  We disagree.

Initially, we note that § 2254(d) provides that the presumption of correctness applies to a proceeding in which the *Applicant* (Farris) and the State or its agent were parties. Nevertheless, Farris contends that "[t]here is nothing ... that stands for the proposition that § 2254(d)'s reference to the participation of the Applicant and the State is an absolute prerequisite to [§ 2254(d)'s] application."  But, the following language from § 2254(d) is just the opposite: "After a hearing on the merits of a factual issue, made by a state court of competent jurisdiction in a proceeding to which *the applicant for the writ* and the State ... were parties". (Emphasis added.)  Farris was not a party to **Riley**, which was rendered nearly three years after **Farris**.

Moreover, although it is true that the § 2254(d) presumption may apply to state trial or appellate courts, *see **Sumner v. Mata***, 449 U.S. 539, 547 (1981), that presumption is reserved for *factual*

*determinations*. **Riley**, in overruling **Farris**, did not make a *finding of fact* regarding Goodson's exclusion. Rather, the court recharacterized Goodson as a non-vacillating venireperson, and then ruled that she was improperly excluded on the basis of her conflicting feelings regarding capital punishment. **Riley**, 889 S.W.2d at 300. Along this line, we fail to understand how, while deciding **Riley**, the Texas Court of Criminal Appeals can, for § 2254(d) purposes, make a factual finding applicable to **Farris.**

Again, as discussed, the finding of juror bias is based upon the determination by the *trial judge*, who, alone among the judges involved at various stages, personally observes the demeanor and credibility of the prospective juror during voir dire. *See* **Witt**, 469 U.S. at 428. Obviously, the **Riley** court did not observe venireperson Goodson during voir dire, and, as a result, could not judge her demeanor and credibility. In short, the ruling in **Riley**, with respect to **Farris**, is a ruling on a question of law; it is *not a factual determination* to which the presumption of correctness afforded by § 2254(d) attaches.

2.

Second, Farris contends that the state trial court is not entitled to the presumption of correctness, because it applied an erroneous legal standard in excluding Goodson. The law is well settled regarding when a prospective juror may be excluded for cause because of her views on the death penalty.

"[O]pposition to capital punishment, in itself, is not sufficient cause for a judge to exclude a member of the jury pool." *Fuller v. Johnson*, 114 F.3d 491, 500 (5th Cir.), *cert. denied,* 118 S. Ct. 399 (1997) (citing *Lockhart v. McCree*, 476 U.S. 162, 176 (1986)). Instead, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath'". *Witt*, 469 U.S. at 424; *see also Mann,* 41 F.3d at 980.

In order, using the appropriate standard, to exclude a prospective juror for cause, it is not necessary "that a juror's bias be proved with 'unmistakable clarity'". *Witt*, 469 U.S. at 424. As the Court noted, "determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'". *Id.* at 424-25.

"Even if the record is silent as to the standard employed by a state trial judge ... he is presumed to have applied the correct standard." *Wicker v. McCotter*, 783 F.2d 487, 493 (5th Cir.), *cert. denied,* 478 U.S. 1010 (1986). But, here, we are not faced with a situation where the trial judge failed to state the standard used to exclude Goodson; rather, as quoted *supra*, the trial judge, in excluding her, stated the standard from *Witt*.

- 22 -

3.

Lastly, Farris contends there is no support in the record for the trial court's determination that Goodson would be *substantially impaired* in her ability to perform her duties as a juror. The trial judge observed Goodson's demeanor and heard her answers during voir dire. Goodson underwent extensive questioning from not only the prosecution and defense, but also the judge, regarding her views on capital punishment and her ability to properly function as a juror.

As reflected in the earlier-quoted voir dire, Goodson stated that she was opposed to capital punishment and that under no circumstances could she vote to return the death penalty. Also, she stated that she would do her best to answer the special issues honestly, and that, despite what the evidence revealed, it would violate her conscience to assess the death penalty in a case where, based on the evidence, it was warranted. The trial judge, at the conclusion of the lengthy questioning and conflicting or inconsistent answers, applied the **Witt** standard and ruled that Goodson's "views on capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with her oath and instructions."

We agree with the district court that "[t]he testimony of Ms. Goodson presents the textbook case for when a reviewing Court, pursuant to a § 2254 review, should defer to the judgment of the

trial judge regarding the credibility and demeanor of a potential juror." *Farris*, 967 F. Supp. at 208. This case vividly demonstrates that, although "mere emotional opposition to capital punishment alone is insufficient cause for juror exclusion, it is equally clear that emotional opposition may rise to the level where it interferes with a potential juror's ability to sit as a dispassionate and objective arbiter of justice." *Mann*, 41 F.3d at 981.

In sum, Farris has failed to overcome the presumption of correctness afforded by § 2254(d) to the trial judge's decision to exclude Goodson. Again, the "credibility determinations [concerning such a decision] are more appropriately resolved under the watchful eye of the trial judge than by an appellate court staring at a cold record, which is precisley why they are accorded a presumption of correctness under 2254(d)." *Id.* at 982.

## B.

The other issue raised by Farris is that his court appointed counsel, Jack Strickland and Bill Lane, labored under an actual conflict of interest that adversley affected their performance, due to the fact that Larry Moore, the original lead prosecutor assigned to Farris' case, resigned from the Tarrant County District Attorney's Office prior to trial, and became professionally associated with Strickland and Lane during their representation of Farris. He asserts that his counsel could not continue to

represent him and, at the same time, pursue allegations that Moore was aware of improprieties in the investigation of Farris' case.

Along this line, Farris asserts that the district court erred in concluding that he had waived any right to a conflict of interest; that it improperly held that the conflict did not have an adverse effect on counsel's performance; and that it applied an erroneous legal standard in evaluating the conflict claim. (As discussed below, because we agree that Farris waived this conflict-claim, we do not reach the other two subissues.)

The Sixth Amendment right to counsel includes, of course, the right to conflict-free-counsel. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). However, "like the right to counsel of any kind, the right to conflict-free counsel can be waived." *United States v. Greig*, 967 F.2d 1018, 1021 (5th Cir. 1992). Therefore, we first address the validity of the waiver executed by Farris; obviously, "the finding of a waiver obviates a determination of whether there was an actual conflict." *United States v. Plewniak*, 947 F.2d 1284, 1287 n.1 (5th Cir. 1991), *cert. denied,* 502 U.S. 1120 (1992).

Farris contends that his waiver was invalid because the affadavit he executed in order to accomplish the waiver contained factual inaccuracies; that it was based on counsel's opinion that the allegations against Moore were meritless; and that the trial court failed to inquire into the effectiveness of his waiver.

The law in our circuit is well established regarding the requirements for a valid waiver of the Sixth Amendment right to conflict-free counsel: "(1) that the defendant be aware that a possible conflict of interest exists; (2) that the defendant realize the consequences to his defense that continuing with conflicted counsel would have; and (3) that the defendant be aware of his right to obtain other counsel." **Crank v. Collins**, 19 F.3d 172, 176 (5th Cir.), *cert. denied,* 512 U.S. 1214 (1994) (citing **United States v. Garcia**, 517 F.2d 272, 278 (5th Cir. 1975)).

Farris executed his affidavit on 18 February 1986, waiving any potential conflict of interest arising from his court appointed counsel's professional relationship with Moore. In the affidavit, Farris states: that his counsel informed him of that relationship, which consisted of an office sharing arrangement; that there existed the potential for a conflict of interest; that counsel had agreed not to discuss Farris' case with Moore; that he (Farris) had been made aware of the allegation implicating Moore in improprieties regarding the destruction of evidence; and that his counsel informed Farris that, in their opinion, the allegation was meritless. The affidavit stated also that Farris was aware of his options: (1) to relieve Strickland and Lane of their representation, have new counsel appointed, and pursue the claims against Moore; (2) to direct Strickland and Moore to pursue the allegations against Moore, which would result in counsel seeking

permission from the court to withdraw; and (3) to agree with Strickland and Moore that the allegations against Moore were meritless and should not be pursued, in which event they would remain as his counsel and he would agree that there was no conflict between Strickland, Lane, and Farris. In the affidavit, Farris stated, that, after carefully reviewing these options, he had decided to choose the third: forego pursuing the allegations against Moore, and continue to be represented by Strickland and Lane.

Moreover, Farris had consulted with Art Brender, an attorney appointed by the trial judge, about his affadavit and the decision not to pursue the allegations regarding Moore. Farris' affidavit concluded with his stating that he had made his decision "freely, voluntarily, and intelligently".

Along this line, in a proceeding prior to his state trial, Farris testified that he had executed the affidavit, and understood the consequences. He testified also about his one hour meeting with Brender, and that they had discussed the ramifications of the waiver-affidavit.

A state court finding that a defendant validly waived his right to conflict-free-counsel is entitled to the § 2254(d) presumption of correctness. *Crank*, 19 F.3d at 176. Again, the presumption applies, unless one of the eight earlier-quoted exceptions exist.

The state habeas court (as noted, the same judge presided at Farris' trial and at the habeas proceeding) reviewed Farris' waiver-affidavit and concluded that he had "waived his right to complain that ... Moore's business relationship with [] defense counsel posed a conflict of interest." The state habeas court concluded further that the waiver was "knowing and voluntary", that the affidavit demonstrated that Farris realized the consequences of Strickland and Lane continuing their representation, and that Farris was aware of his right to obtain other counsel.

"This Court has held on many occasions that a state court 'paper hearing' is sufficient to allow a federal court to invoke the § 2254(d) presumption of correctness to the state court's findings when the state habeas judge also presided over the petitioner's trial." *Baldree v. Johnson*, 99 F.3d 659, 663 (5th Cir. 1996), *cert. denied,* 117 S. Ct. 1489 (1997) (citing *Perillo v. Johnson*, 79 F.3d 441, 446 (5th Cir. 1996); *Vuong v. Scott*, 62 F.3d 673, 683-84 (5th Cir.), *cert. denied,* 516 U.S. 1005 (1995)). The state trial judge observed Farris as he testified about his waiver-affidavit, and, indeed, appointed counsel so that Farris could, with the advice of independent counsel, decide whether to waive any conflict of interest. That same judge examined the waiver-affidavit during the state habeas proceeding.

As noted, in this regard, Farris maintains that his affidavit contained a factual inaccuracy, which invalidates any waiver of a

potential conflict of interest. The affidavit states that Farris was told that one Sheriff's Deputy had accused Moore of being involved in the destruction of evidence. Farris contends that it was actually two deputies, and that this difference is significant because "corroborated testimony always carries more weight than the uncorroborated testimony of a single witness". However, Farris failed to produce affidavits, or any supporting documents, regarding the testimony of either deputy.

Along this line, at the state habeas proceeding, the trial court, in its findings of fact regarding the allegation that Moore was involved in the destruction of evidence, stated that Moore had heard that two deputies had alleged that they had told him (Moore) about the destruction of evidence. The trial court also noted that Farris' affidavit claimed that one deputy made allegations against Moore. Thus, the state habeas court, in concluding that Farris validly waived any potential conflict of interest, appears to have considered the fact that there was a factual inconsistency in the affidavit. (In the state habeas proceeding, Farris did not specifically raise the subissue that a factual inaccuracy invalidated his waiver; but, as noted, the state court, in the findings of fact, seems to note the inconsistency, yet still concluded that the waiver was valid. Farris did raise the subissue in his federal habeas proceeding.)

Again, Farris did not produce the affidavits or any supporting documents of either one of the deputies. He has failed to

- 29 -

demonstrate how the purported factual inaccuracy, if any, in his affidavit, invalidated his waiver.

In sum, in executing the waiver, Farris was aware that a potential for conflict existed, was aware of the consequences of continuing to be represented by Strickland and Lane, and was aware of his right to obtain other counsel.  He has failed again to overcome the § 2254(d) presumption of correctness.

## III.

For the foregoing reasons, the denial of habeas relief is

*AFFIRMED.*